Paul A. Conant, 012667
**CONANT LAW FIRM, PLC**
2398 East Camelback Road, Suite 925
Phoenix, Arizona 85016
Telephone: 602.508.9010
Facsimile:  602.508.9015
Email: docket@conantlawfirm.com

Shannon L. Hopkins, Esq.
Sebastiano Tornatore, Esq.
**LEVI & KORSINSKY, LLP**
733 Summer Street, Suite 304
Stamford, CT 06901
Tel:     (212) 363-7500
Fax:    (866) 367-6510
Email: shopkins@zlk.com;
          stornatore@zlk.com
          Attorneys for plaintiff

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MILTON PFEIFFER, individually and on behalf of all others similarly situated, | Case No._____ |
| Plaintiff,<br>v. | **CLASS ACTION COMPLAINT** |
| PAUL J. BONAVIA, DAVID G. HUTCHENS, LAWRENCE J. ALDRICH, BARBARA M. BAUMANN, LARRY W. BICKLE, ROBERT A. ELLIOTT, DANIEL W. FESSLER, LOUISE L. FRANCESCONI, RAMIRO G. PERU, GREGORY A. PIVIROTTO, JOAQUIN RUIZ, UNS ENERGY CORPORATION, FORTISUS INC., COLOR ACQUISITION SUB INC., and FORTIS, INC., | (Jury Trial Demanded) |
| Defendants. | |

Plaintiff Milton Pfeiffer ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

1.      Plaintiff brings this class action on behalf of himself and the public stockholders of UNS Energy Corporation ("UNS" or the "Company") against the members of UNS's Board of Directors (collectively, the "Board" or the "Individual Defendants") for their breaches of fiduciary duties arising out of their proposal to sell the Company to Fortis, Inc. ("Fortis") through an unfair process and at an unfair price.

2.      UNS is the parent corporation of Tucson Electric Power ("TEP") and UniSource Energy Services ("UES").  TEP, the second-largest investor-owned utility in Arizona, provides power to over 400,000 customers in the Tucson metropolitan area.  UES provides both natural gas and electric services to over 237,000 customers across Arizona. UES sells natural gas to approximately 147,000 customers in northern and southern Arizona and electric service to over 91,000 customers in Mohave and Santa Cruz Counties.

3.      Fortis is the largest investor-owned gas and electric distribution utility in Canada.  In addition to its extensive Canadian operations, Fortis owns utility operations in New York, the Caribbean, and Belize and non-utility investments in the United States' Mid-Atlantic Region.  Fortis distributes electricity to more than 2.4 million customers in Canada, New York, and the Caribbean.  Fortis runs its U.S. utility operations through FortisUS, Inc. ("FortisUS").

4.      On December 11, 2013, UNS and Fortis announced that they had entered into a definitive Agreement and Plan of Merger ("Merger Agreement").  Pursuant to the Merger

Agreement's terms, Color Acquisition Sub Inc. ("Merger Sub"), a wholly-owned subsidiary of FortisUS, shall be merged with and into UNS.  The Merger Sub will accomplish this by acquiring all of UNS's outstanding common stock for $60.25 per share in cash (the "Proposed Transaction").  The Proposed Transaction is valued at approximately $4.3 billion.

5.     The Board breached their fiduciary duties by failing to maximize shareholder value in connection with the Proposed Transaction.  As described in more detail below, given UNS's position for growth, the consideration provided under the Proposed Transaction is inadequate and undervalues the Company.

6.     Defendants have exacerbated their breaches of fiduciary duty by entering into a Merger Agreement that locks up the Proposed Transaction with deal protection devices. These devices preclude other bidders from making a successful competing offer for the Company and, as such, prevents the Company from accepting superior acquisition proposals.  Specifically, pursuant to the Merger Agreement, Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) a provision that provides Fortis with one business day to match any competing proposals in the event one is made; and (iii) a provision that requires the Company to pay Fortis a termination fee of approximately $63,900,000 in order to enter into a transaction with a superior bidder.  These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives.

1    7.    The Individual Defendants have breached their fiduciary duty of care by

2    failing to maximize shareholder value. Plaintiff seeks to enjoin the Proposed Transaction

3    unless and/or until the Individual Defendants cure this breach of fiduciary duty.

4                                        **PARTIES**

5    8.    Plaintiff, a citizen of New York, is, and has been at all relevant times, the

6    owner of shares of common stock of UNS.

7    9.    UNS is a corporation organized and existing under the laws of the State of

8    Arizona.  It maintains its principal executive offices at 88 E. Broadway Boulevard, Tucson,

9    AZ 85701.

10   10.    Paul J. Bonavia ("Bonavia"), a citizen of Arizona, is the Chairman of the

11   Board and Chief Executive Officer of UNS and TEP.  He has held these positions since

12   January 2009.  He also served as President of UNS and TEP from January 2009 to

13   December 2011.  Prior to joining UNS, Bonavia served as President of the Utilities Group

14   of Xcel Energy.  He also served as President of Xcel's Commercial Enterprises business

15   unit and Energy Market unit.

16   11.    David G. Hutchens ("Hutchens"), a citizen of Arizona, has served as the

17   President of UNS and TEP since December 2011.  He is also a member of the Board.  He

18   previously served as the Executive Vice President of UNS and TEP from March to

19   December 2011, as Vice President of Energy Efficiency and Resource Planning from May

20   2009 to March 2011, and as Vice President of Wholesale Energy at UNS and TEP from

21   January 2007 to May 2009.  Hutchens joined TEP in 1995.

22

12.     Lawrence J. Aldrich ("Aldrich"), a citizen of Arizona, has served on the Board since 2000.   He is also the Chairman and Executive Director of the Arizona Business Coalition on Health, a position he has held since October 2011.

13.     Barbara M. Baumann ("Baumann"), a citizen of Colorado, has served on the Board since 2005.  She is the President and Owner of Cross Creek Energy Corporation, a management consultant and investor company specializing in the oil and gas sector.

14.     Larry W. Bickle ("Bickle"), a citizen of Texas, has served on the Board since 1998.  He is also a director of SM Energy Company, an oil and gas production company.

15.     Robert A. Elliot ("Elliott"), a citizen of Arizona, has served on the Board since 2003.   He is also the President and owner of Elliott Accounting, an accounting, tax, management, and investment advisory firm.

16.     Louise L. Francesconi ("Francesconi"), a citizen of Arizona, has served on the Board since 2008.

17.     Joaquin Ruiz ("Ruiz"), a citizen of Arizona, has served on the Board since 2005.  He is also a professor of geosciences at the University of Arizona.

18.      Gregory P. Pivirotto ("Pivirotto"), a citizen of Arizona, has served on the Board since 2008.  He is also an adjunct professor at the University of Arizona College of Law.

19.     Ramiro G. Peru ("Peru"), a citizen of Arizona, has served on the Board since 2008.

20.    Daniel W. Fessler ("Fessler"), a citizen of California, has served on the Board since 2005.

21.    FortisUS is a Delaware corporation and is a wholly-owned subsidiary of Fortis.

22.    Merger Sub is an Arizona corporation and a wholly-owned subsidiary of FortisUS.

23.    Fortis is a publicly traded holding company existing under the laws of Newfoundland and Labrador, Canada.  Fortis's principal place of business is the Fortis Building, Suite 1201, 139 Water Street, St. John's, Newfoundland, NL A1B.  Fortis is traded on the Toronto Stock Exchange under the symbol FTS.

## JURISDICTION AND VENUE

24.    The Court has subject matter jurisdiction over this action.  As alleged above in paragraphs 8 through 23, Plaintiff is a citizen of New York and defendants are all citizens of other states; and the amount in controversy exceeds $5,000,000.

25.    The Court has personal jurisdiction over all the parties to this lawsuit. Plaintiff submits to the jurisdiction of this Court and the defendants are all either citizens of Arizona or have purposefully availed themselves to the benefits and protections offered by the forum state.

26.    Venue is properly situated in this District.  UNS is both incorporated and maintains its corporate headquarters in this district, many of the defendants are citizens of

Arizona, and many of the facts and circumstances giving rise to this action took place in this District.

**THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

27.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other shareholders of UNS and owe Plaintiff and the other members of the Class (defined herein) the duties of good faith, fair dealing, loyalty and full and candid disclosure.

28.     By virtue of their positions as directors and/or officers of UNS, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause UNS to engage in the practices complained of herein.

29.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to obtain adequate value for shareholders and its constituents rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the shareholders to make an informed voting decision.  To diligently comply with this duty, the directors of a corporation may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

-7-

(b)     contractually prohibits them from complying with or carrying out their fiduciary duties;

(c)     discourages or inhibits alternative offers to purchase control of the corporation or its assets;

(d)     will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

30.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiff and the other shareholders of Costa, including their duties of loyalty, good faith and independence, insofar as they, *inter alia*, engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiff or the other shareholders of Costa common stock.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all owners of UNS common stock as of December 11, 2013, the date UNS and Fortis announced the Proposed Transaction (the "Class").  Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors, or assigns and any entity in which Defendant have or had a controlling interest.

32.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  According to the Merger Agreement, the Company represented that as of December 11, 2013, approximately 41 million shares of UNS common stock were outstanding.  All members of the Class may be identified from records maintained by UNS or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

33.     Questions of law and fact in common to the Class include, *inter alia*, the following:

(a)     Have the Individual Defendants breached their fiduciary duties of undivided loyalty or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(b)     Have the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(c)     Have Fortis, FortisUS, and the Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(d)     Whether Plaintiff and the other members of the Class would be irreparably harmed if the transactions complained of herein were consummated.

34.     Plaintiff's claims are typical of claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

35.     Plaintiff is committed to prosecuting this action, will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

36.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the parties opposing the Class.

37.     Conflicting adjudications for individual members of the Class might, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interest.

38.     Defendants have acted on grounds generally applicable to the class, making appropriate final injunctive relief with respect to the Class as a whole.

## FURTHER SUBSTANTIVE ALLEGATIONS

*Company Background and its Poise for Growth*

39.     UNS was founded in 1902 in Tucson, Arizona.   Formerly known as UniSource Energy Corporation, UNS is a utility services holding company engaged, through its subsidiaries, in the generation and distribution of electricity.

40.     UNS wholly owns four of its subsidiaries, TEP, UES, Millennium Energy Holdings, Inc. ("Millennium"), and UniSource Energy Development Company ("UED").

41.     TEP generates, transmits, and distributes electricity to approximately 406,000 retail customers in a 1,155 square mile area of southeastern Arizona.  TEP's customers are residences, business, industries, and the government.  It sells some of the electricity it generates to other utilities in the western United States.  As of December 31, 2012, TEP owned or leased 2,267 megawatts of net generating capacity, as well as owned or participated in an electric transmission and distribution system consisting of 564 circuit-miles of 500 kV lines, 1,088 circuit-miles of 345-kV lines, 405 circuit-miles of 138-kV lines, 481 circuit-miles of 46-kV lines, and 2,612 circuit miles of lower voltage primary lines.  TEP also operates the Springerville Generating Station Unit 3 on behalf of the Tri-State Generation and Transmission Association, Inc. and the Springerville Unit 4 on behalf of the Salt River Agriculture Improvement and Power District.

42.     UES holds some of the common stock of two other regulated public utilities, UNS Gas, Inc. and UNS Electric, Inc.  UNS Gas is a gas distribution company, which serves approximately 149,000 customers in Mohave, Yavapai, Coconino, Navajo, and Santa Cruz counties.  UNS Electric is a public utility, which generates, transmits, and distributes electricity to approximately 92,000 customers in Mohave and Santa Cruz counties.

43.     Both Millennium and UED focus on the unregulated aspects of the energy market.  Their investments in this segment represented less than one percent of UNS's assets as of December 31, 2012.

44.     Though UNS's financial results for the 2012 fiscal year did not compare favorably with its results for 2011, these results were due to temporary setbacks and unforeseen circumstances rather than structural weaknesses in UNS's business model.

45.     On February 26, 2013, UNS issued a press release in which it reported its fiscal year 2012 earnings.  UNS stated that it had a net income of $90.9 million in 2012, or $2.20 per diluted share of common stock.  This compared to a net income of $110.0 million, or $2.75 per diluted share, in 2011.

46.     On that same day, key UNS executives held an earnings call to explain the 2012 fiscal year results.  Specifically, they discussed why the financials for the 2012 fiscal year were down when compared to the financials for the 2011 fiscal year.  Bonavia began by describing an "unplanned outage" that TEP experienced at Springerville Unit 3.  He stated:

> TEP operates that unit on behalf of Tri-State, and we can earn operating fees and performance bonuses for doing so.  That outage caused TEP to miss certain performance targets in 2012.  As a result, 2012 earnings per share reflect a reduction of approximately $0.05 per diluted share.

47.     Bonavia also discussed a partial write-off that UNS made in relation "to a proposed transmission project."  The write-off "was occasioned by the likelihood that [UNS] will abandon the project as well as a provision in TEP's pending rate case settlement agreement regarding recovery of cost related to that project.  The write-off reduced 2012 diluted earnings per share by approximately $0.07."

48.     Further, Bonavia explained that 2011's earnings also included a one-off "gain of approximately $0.11 per diluted share related to the settlement of a transmission dispute"

with another electric company.  In sum, excluding these three items, "earnings for 2012 were approximately $2.32 per diluted share compared with $2.64 in 2011."

49.    In this call, Bonavia also flagged a "few of [UNS's] notable achievements" for the 2012 fiscal year.  In particular, he stated that:

> We once again delivered earnings within our stated guidance range.  The effects of slow economic recovery, energy efficiency and distributed generation on our retail energy sales as well as an outdated retail rate structure and TEP created significant challenges in 2012.  We responded to the ongoing pressure on margins by identifying operating efficiencies and process improvements.

50.    The "outdated retail rate structure" to which Bonavia referred is a settlement entered into by TEP and the Arizona Corporate Commission (the "ACC") in 2008.  The ACC is the Arizona public agency that is responsible for granting or denying utility rate adjustments.  According to a May 29, 2008 press release issued by UNS, TEP and the ACC "agreed to a settlement that would increase [TEP's] base rates by approximately 6 percent beginning no later than Jan. 1, 2009."  After that increase, TEP could not raise its rates again until 2013 at the earliest.

51.    Further underlining the temporary nature of the setback that the Company experienced in 2012, UNS has been performing well over the course of the 2013 fiscal year. In an April 29, 2013 press release, the Company announced its earnings for the first quarter of 2013.  UNS's net income for this quarter was $11.3 million, or $0.27 per diluted share of common stock.  This compares to a net income of $6.5 million, or $0.17 per diluted share, in the first quarter of 2012.  TEP also reported good results for the quarter.  TEP had a net income of $1.5 million compared with a net loss of $1.5 million in the first quarter of 2012.

-13-

52.     On July 30, 2013, UNS issued a press release announcing its second quarter 2013 earnings.  The Company's net income for the second quarter was $34.6 million, or $0.83 per diluted share of common stock, compared with net income of $26.3 million, or $0.64 per diluted share, in the second quarter of 2012.  For the six months that ended on July 30, 2013, UNS's net income was $40.6 million, or $1.10 per diluted share, compared with $32.7 million, or $0.81 per diluted share, in the same period in 2012.

53.     UNS also released TEP's second quarter earnings.  During this quarter, TEP reported a net income of $30.8 million compared with a net income of $21.9 million in 2012.

54.     In the same press release, the Company announced that the ACC approved new rates for TEP.  The new rates, which were the product of negotiations between the Company and the ACC that began in the first quarter of 2013, became effective on July 1, 2013.  The rates "include[d] TEP's first base rate increases since 2008."  Bovania commented on the importance of the new rates in the press release.  He stated that, "Our second quarter results mark the end of a four and a half year base rate freeze at TEP.  The rate freeze, coupled with little to no economic growth, created significant challenges during this period."  He continued, "TEP's new retail rates promote stability and strengthen TEP's financial position, bolstering our ability to make long-term investments that are in the best interests of our customers."

-14-

55.     Bovania also spoke about the importance of the rate increase in a conference call with investors that accompanied the release of the second quarter 2013 earnings.  He stated:

> The approval of TEP's new rates by the [ACC] in June, fairly balances the needs of our customers with the long term financial stability of TEP.  TEP's new rate structure which became effective July 1, contains a modest increase of less than $4 per months [sic] for the average residential customer.  It has new cost recovery mechanisms that help to mitigate regulatory lag, and our reiteration and rate design changes that give our customers easier to understand rate options and stabilize our ability to recover fixed cost.

56.     In addition, Bovania mentioned certain changes to UNS's market that would greatly benefit the Company.  Specifically, he said:

> Earlier this month Augusta Resources announced that it's in the final permitting stages for the Rosemont Copper mine.  The remaining permits include getting the final environmental impacts statement and record of decision from the U.S. force service as well as section 404 water permit from the army core of engineers.  Augusta estimates that it can start mine construction later this year and begin production in 2015.

> Once in full production Rosemont would become based on current estimates TEP's largest customer with an estimated load of 85 megawatts.  Turning to Tucson housing market, June closings were 9% above last year, the median price of homes sold increased by 15%.  In June university of Arizona's economic research center updated their economic forecast for Tucson, they still call for the recovery to gain traction later in 2013 and for accelerated growth in 2014 and '15.

57.     During the same conference call, Kevin Larson ("Larson")—the Company's Senior Vice President and Chief Financial Officer—also discussed the impact that the Rosemont mine would have on the Company's revenues.  He stated that UNS has the

1   "capacity to serve Rosemont, we don't have to go build something or buy something, so the

2   revenue effect kicks right in."

3       58.     On the call, Bonavia also commented on why he thought that the Company

4   was well-positioned for future growth.  He stated that:

5       I like the way our [investment path] curve looks as we've disclosed it in that,
        we are adding the rate base but we're adding at a nice manageable moderate
6       financeable pace and our rate base investment is spread across the value
        change that we don't have single big investments that bring high risk or
7       political controversy or for some other reason have a bull's eye painted on
        them.
8
        So we have a nice measure but increasing base investment, we have a spread
9       around the value chain which reduces the risk of rate base growth and then we
        have layered on top of that question of what asset mix we're going to pick up
10      [going forward] and that one is where the highest level of uncertainty is right
        now because we are right in the thick of those decisions today.  So what does
11      that translate into for an earnings path?  We will give you the drivers and the
        sensitivity factors but it's a pretty reasonably predictable operating path over
12      the next few years.  We expect some modest sales growth particularly if the
        economy behaves the way the economists say it will.  We've got the TEP rate
13      case in effect.  We may well have new rates in effect for UNS Electric which
        will perhaps contribute some additional growth.  We will keep you posted on
14      that.  We have the steady rate base growth and all the pieces are there.

15      59.     On November 6, 2013, the Company issued a press release announcing its

16  third quarter 2013 earnings.  As with the previous two quarters, the Company's income in

17  the third quarter was higher in 2013 than it was in 2012.  Specifically, UNS's net income for

18  the third quarter 2013 was $68.0 million, or $1.62 per diluted share of common stock,

19  compared with net income of $50.7 million, or $1.21 per diluted share, in the third quarter

20  of 2012.  For the nine months that ended September 30, 2013, UNS's net income was

21

22
                                            -16-

1  $114.0 million, or $2.72 per diluted share, compared with $83.4 million, or $2.03 per

2  diluted share, in the same period in 2012.

3       60.    TEP's income was also up in the third quarter of 2013.  TEP reported net

4  income of $64.2 million in that quarter, compared with net income of $44.6 million in the

5  third quarter of 2012.

6       61.    UNS also provided guidance for 2014 in the November 6 press release.  UNS

7  stated that it expects its diluted earnings per share to be between $3.15 and $3.45 in 2014,

8  which compared to projected diluted earnings per share of $2.95-$3.10 for 2013.   The

9  release quoted Bonavia as saying that UNS's "financial outlook for 2014 reflects a full year

10 of TEP's new retail rate structure and a reduction in TEP's capital lease expenses."  Bonavia

11 also stated that UNS "project[ed that its] 2015 diluted earnings per share [would] be above

12 2014 levels."

13      62.    Further, UNS used the November 6 press release to announce a number of key

14 acquisitions by TEP.  First, TEP decided "to purchase approximately 35.4 percent of the

15 output of the coal-fired Springerville Generating Station Unit 1 [ ].  TEP currently receives

16 all of the output from the 387 megawatt (MW) facility through a 14.1 percent ownership and

17 leases for the remainder.  The planned purchase of 35.4 percent of [the Spingerville Unit]

18 would bring TEP's ownership to approximately 49.5 percent when the current leases expire

19 on January 1, 2015."

20      63.    Second, TEP announced that "it [was] in exclusive negotiations to purchase a

21 550 MW gas-fired combined-cycle generating unit at the Gila River Generating Station

22

(Gila River) in Gila Bend, Ariz." TEP estimated that the purchase would be finalized in late 2014.

64.     UNS's executive expounded upon some of the information provided in the November 6 press release in an accompanying conference call with investors. For example, Bonavia explained why he believed that the Company would grow in 2014 and 2015. He stated:

> The successful execution of our long-term resource strategy, the continued reduction in TEP's capital lease expense and the new and pending rate structures at TEP and UNS Electric, give us confidence that we can grow earnings over the next two years in spite of various cost pressures.

65.     Bonavia also reported that TEP was "making significant progress toward diversifying [its] generating fuel mix. During the third quarter, [TEP] committed to purchase approximately 35% of the capacity of Springerville Unit 1 that is currently leased by TEP. TEP will pay approximately $65 million or $478 per kilowatt for ownership of 137 megawatt of continuous operating capability." Bonavia continued, "[a]nother important component of [TEP's] resource strategy is the San Juan Generating Station. In September, the New Mexico Environmental Improvement Board approved the current plant that would lead to the retirement of San Juan Units 2 and 3 by the end of 2017, as well as the installation of selective non-catalytic reduction or SNCR technology on Units 1 and 4 by early 2016."

66.     According to Bonavia, the Gila River facility will provide UNS "with [more] flexibility to meet peak demand and integrate cost effective renewable resources into [its] system."

-18-

***The Proposed Transaction is Unfair***

67.     In a press release dated December 11, 2013, the Company announced that it had entered into a merger agreement with Fortis.   Under the terms of the Merger Agreement, Fortis will acquire all of UNS's outstanding common stock for $60.25 per share in cash.  The Proposed Transaction is valued at $4.3 billion and it includes the assumption by Fortis of UNS's approximately $1.8 billion in debt.

68.     Given the Company's recent performance and its positioning for growth, the consideration provided under the Proposed Transaction is unfair and undervalues the Company.

69.     As detailed extensively above, UNS's growth prospects are very good.  The Company recently negotiated a deal with the ACC that allows the Company to raise its base rates on its customers.  This is a significant development for the Company.  For the first time since 2008, the Company is allowed to raise its rates to take into account the very different economic climate that it faces now than it faced in 2008.

70.     Further, UNS, through its TEP subsidiary, has taken substantial steps to diversify its energy production abilities.  For example, in the third quarter of 2013 alone, UNS announced that TEP purchased an additional 35.4% of the Springerville Generating Station Unit 1, increasing its ownership stake by 21.3%.  TEP also entered into negotiations to purchase all of a gas-fired combined-cycle generating unit in Gila Bend, Arizona. Finally, TEP received a series of key permits that are necessary to its plan to bring online the new San Juan Generating Station.

71.     UNS is also well-positioned to take advantage of the improving economic climate in Arizona.  UNS emphasized repeatedly that Arizona's economic recovery is predicted to gain traction in 2013 and accelerate even more in 2014 and 2015.  As the regional economy continues to grow, demand for energy will increase.  That demand will result in increased revenue for UNS.  An example of the growth in the regional economy is the development of the Rosemont Copper mine.  If the mine starts operating, it will be UNS's single biggest client.

72.     UNS's beneficial positioning is evidenced by the fact that even when the economy remained weak, such as in 2012, the Company continued to perform well.  In 2012, as in previous years, the Company delivered earnings within its stated guidance range.  UNS would not have been able to do that had its fundamentals not been strong.  These fundamentals will serve the Company well as the economy of Arizona continues to improve over the course of the next few years.

***Defendants Agreed to Preclusive Deal Protection Provisions***

73.     The Proposed Transaction is also unfair because as part of the Merger Agreement, Defendants agreed to certain onerous terms and preclusive deal protection devices that operate to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

74.     Specifically, § 5.4 of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in

order to procure a price in excess of the amount offered by Fortis.   According to this Section, the Company

> shall not, and shall cause [its subsidiaries] not to, and shall not authorize or permit any of its officers, directors, or employees to, and shall instruct [its directors, officers, employees, accountants, consultants, legal counsel, advisors, agents, and other representatives (the "Representatives")] not to on behalf of the Company, directly or indirectly, (i) initiate, solicit or knowingly encourage or facilitate the submission of any [merger proposal], or any inquiry or proposal that could reasonably be expected to lead to a[ merger proposal], or (ii) participate in any discussions or negotiations with any person, or furnish to any person any information, with respect to a[ merger proposal], or any inquiry or proposal that could reasonably be expected to lead to a[ merger proposal]. The Company shall, and shall cause [its subsidiaries] and the [Representatives] to, immediately cease and cause to be terminated any discussion or negotiation with any Persons conducted prior to the date hereof by the Company, [its subsidiaries] or any of the [Representatives] with respect to any [merger proposal].

75.     Section 5.4(c) of the Merger Agreement also contains a "matching rights" provision, whereby the Company must promptly notify Fortis within one business day should it receive an unsolicited competing merger proposal.   The provision states that the Company

> shall as promptly as reasonably practicable (and in any event within one (1) Business Day) notify [FortisUS] in writing in the event that the Company receives any written [outside merger proposals], including the material terms and conditions of such [merger proposal], or any inquiry that would reasonably be expected to lead to a[ merger proposal]. The Company shall (i) keep [FortisUS] informed, in all material respects, on a reasonably prompt basis, of the status, and details of any such [merger proposal] (including any change to the material terms and conditions thereof) and (ii) provide to [FortisUS] as soon as reasonably practicable (and in any event within one (1) Business Day and at least one (1) Business Day prior to making any determination with respect to such [merger proposal]) after receipt or delivery thereof copies of all written material (including draft agreements) specifying the material terms and conditions of such [merger proposal] exchanged between the Company, [its subsidiaries] or the [Representatives], on the one

hand, and the Person making such [merger proposal] (or its representatives), on the other hand.

76.     The Merger Agreement also provides that a termination fee of approximately $63,900,000 must be paid to Fortis by UNS if UNS decides to pursue the competing offer. The substantial termination fee will ensure that no competing offer will appear, as any competing offer would essentially pay a premium for the right to provide the shareholders with a superior offer.

77.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The narrow circumstances under which the Board may respond to alternative proposals and the Company's inability to terminate the Merger Agreement if it accepts a superior proposal fail to provide an effective "fiduciary out" under the Merger Agreement.  The circumstances under which the Board may respond to an unsolicited, written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

78.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**CLAIMS FOR RELIEF**

**COUNT I**
**Breach of Fiduciary Duties**
**(Against All Individual Defendants)**

79.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.     The Individual Defendants' recommendation of the Proposed Transaction will result in change of control of the Company, which imposes heightened fiduciary responsibilities to maximize UNS's value for the benefit of the shareholders and requires enhanced scrutiny by the Court.

81.     By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants are attempting to deprive unfairly Plaintiff and other members of the Class of the true value of their investment in UNS, or have otherwise failed to secure the best price reasonable under the circumstances for Plaintiff and other members of the Class.

82.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have breached their fiduciary duty of due care owed to the public shareholders of UNS.

83.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not received and will not receive their fair portion of the value of UNS's assets and will be prevented from benefiting from a value-maximizing transaction.

84.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

**SECOND CAUSE OF ACTION**
**Aiding and Abetting**
**(Against Fortis, FortisUS, and the Merger Sub)**

85.     Plaintiff repeats and realleges each allegation set forth herein.

86.     As alleged in more detail above, Fortis, FortisUS, and the Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duties.

87.     As a result, Plaintiff and the Class members are being harmed.

88.     Plaintiff and the Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     Declaring this action to be a proper class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

(B)     Declaring that the Individual Defendants have breached their fiduciary duties;

(C)     Declaring that the Merger Agreement and Proposed Transaction were entered into in breach of the Individual Defendants' fiduciary duties and is therefore unlawful and unenforceable;

1    (D)    Preliminarily and permanently enjoining Defendants and all those

2    acting in concert with them from consummating the Proposed Transaction or performing the

3    same until such time, as any, that the Individual Defendants have adequately undertaken all

4    appropriate and available methods to maximize shareholder value;

5    (E)    In the event that the Proposed Transaction is consummated prior to the

6    entry of this Court's final judgment, rescinding the Merger Agreement and Proposed

7    Transaction, and/or awarding actual and punitive damages, with pre- and post-judgment

8    interest to Plaintiff and the other members of the Class;

9    (F)    Directing that Defendants account to Plaintiff and the other members of

10   the Class for all damages caused by them and account for all profits and any special benefits

11   obtained as a result of their breaches of their fiduciary duties;

12   (G)    Awarding Plaintiff the costs of this action, including a reasonable

13   allowance for the fees and expenses of Plaintiff's attorneys and experts; and

14   (H)    Granting Plaintiff and the other members of the Class such further

15   relief as the Court deems just and proper.

16   Respectfully submitted this 27th day of December 2013.

17   **CONANT LAW FIRM, PLC**

18   By:   /s/ Paul A. Conant
            Paul A. Conant
19          Northern Trust Bank Tower, Suite 925
            2398 East Camelback Road
20          Phoenix, Arizona  85016

21

22

1

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins, Esq.

2

Sebastiano Tornatore, Esq.
733 Summer Street, Suite 304

3

Stamford, CT 06901
                              *Attorneys for Plaintiff*

4

5

6

CERTIFICATE OF SERVICE

7

      I hereby certify that on December 27, 2013, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and electronic service.

8

9

/s/ Kelly Naughton

10

11

12

13

14

15

16

17

18

19

20

21

22