Paul A. Conant, 012667
**CONANT LAW FIRM, PLC**
2398 East Camelback Road, Suite 925
Phoenix, Arizona 85016
Telephone: 602.508.9010
Facsimile:  602.508.9015
Email: docket@conantlawfirm.com

Shannon L. Hopkins, Esq.
**LEVI & KORSINSKY, LLP**
733 Summer Street, Suite 304
Stamford, CT 06901
Tel:    (212) 363-7500
Fax:    (866) 367-6510
Email:shopkins@zlk.com;
      Attorneys for plaintiff

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MILTON PFEIFFER, individually and on behalf of all others similarly situated,<br><br>         Plaintiff,<br>    v.<br><br>PAUL J. BONAVIA, DAVID G. HUTCHENS, LAWRENCE J. ALDRICH, BARBARA M. BAUMANN, LARRY W. BICKLE, ROBERT A. ELLIOTT, DANIEL W. FESSLER, LOUISE L. FRANCESCONI, RAMIRO G. PERU, GREGORY A. PIVIROTTO, JOAQUIN RUIZ, UNS ENERGY CORPORATION, FORTISUS INC., COLOR ACQUISITION SUB INC., and FORTIS, INC.,<br><br>        Defendants. | Case No. 4:13-cv-02619-JGZ<br><br>**AMENDED CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>(Jury Trial Demanded) |

Plaintiff Milton Pfeiffer ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

1.      Plaintiff brings this class action on behalf of himself and the public stockholders of UNS Energy Corporation ("UNS" or the "Company") against the members of UNS's Board of Directors (collectively, the "Board" or the "Individual Defendants") for their breaches of fiduciary duties arising out of their proposal to sell the Company to Fortis, Inc. ("Fortis") through an unfair process, at an unfair price, and pursuant to materially false and misleading disclosure.   Plaintiff also asserts class claims against the Individual Defendants for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      UNS is the parent corporation of Tucson Electric Power ("TEP") and UniSource Energy Services ("UES").   TEP, the second-largest investor-owned utility in Arizona, provides power to over 400,000 customers in the Tucson metropolitan area.   UES provides both natural gas and electric services to over 237,000 customers across Arizona. UES sells natural gas to approximately 147,000 customers in northern and southern Arizona and electric service to over 91,000 customers in Mohave and Santa Cruz Counties.

3.      Fortis is the largest investor-owned gas and electric distribution utility in Canada.   In addition to its extensive Canadian operations, Fortis owns utility operations in New York, the Caribbean, and Belize and non-utility investments in the United States' Mid-Atlantic Region.   Fortis distributes electricity to more than 2.4 million customers in Canada,

New York, and the Caribbean.  Fortis runs its U.S. utility operations through FortisUS, Inc. ("FortisUS").

4.      On December 11, 2013, UNS and Fortis announced that they had entered into a definitive Agreement and Plan of Merger ("Merger Agreement").  Pursuant to the Merger Agreement's terms, Color Acquisition Sub Inc. ("Merger Sub"), a wholly-owned subsidiary of FortisUS, shall be merged with and into UNS.  The Merger Sub will accomplish this by acquiring all of UNS's outstanding common stock for $60.25 per share in cash (the "Proposed Transaction").  The Proposed Transaction is valued at approximately $4.3 billion.

5.      The Proposed Transaction is the product of a flawed process that is designed to ensure the sale of UNS to Fortis on terms preferential to defendants and other UNS insiders and to subvert the interests of plaintiff and the other public stockholders of the Company.  The Proposed Transactions is being driven by conflicted Company senior management and the Individual Defendants, certain of whom have been guaranteed a role in the post-closing future of the Company, where they will continue prospering at the expense of the public shareholders who had previously invested in UNS, only to be cashed out at the insufficient merger consideration of $60.25 per share.

6.      UNS was informed years ago that Fortis' intended acquisition of the Company would result in nearly all of the Company's senior management being retained in their same capacities post-merger.  With the known prospect of continued employment, Company management steered a sales process towards Fortis and away from any other potential acquirer, despite their expressed interest, and the Individual Defendants endorsed this

1    favoritism upon recognizing that certain members of the Board would also be retained post-

2    Merger.

3           7.      In addition to participating in any future prosperity of the Company by virtue

4    of their continued positions with a Fortis-controlled UNS, the Proposed Transaction also

5    offer liquidity to the Individual Defendants and senior management, as their illiquid

6    holdings shed their restrictions as a result of the Merger Agreement, creating a collective

7    windfall of ***more than \$42 million, with nearly \$19 million*** going to the Individual

8    Defendants.

9           8.      The Board breached its fiduciary duties by failing to maximize shareholder

10    value in connection with the Proposed Transaction. As described in more detail below,

11    given UNS's position for growth, the consideration provided under the Proposed

12    Transaction is inadequate and undervalues the Company.

13           9.      Defendants have exacerbated their breaches of fiduciary duty by entering into

14    a Merger Agreement that locks up the Proposed Transaction with deal protection devices.

15    These devices preclude other bidders from making a successful competing offer for the

16    Company and, as such, prevents the Company from accepting superior acquisition

17    proposals. Specifically, pursuant to the Merger Agreement, Defendants agreed to: (i) a strict

18    no-solicitation provision that prevents the Company from soliciting other potential acquirers

19    or even continuing discussions and negotiations with potential acquirers; (ii) a provision that

20    provides Fortis with one business day to match any competing proposals in the event one is

21    made; and (iii) a provision that requires the Company to pay Fortis a termination fee of

22

1    approximately $63,900,000 in order to enter into a transaction with a superior bidder.  These

2    provisions substantially and improperly limit the Board's ability to act with respect to

3    investigating and pursuing superior proposals and alternatives.

4        10.    In further breach of their fiduciary duties, on January 23, 2014, defendants

5    filed a Schedule 14A Proxy Statement (the "Proxy") with the United States Securities and

6    Exchange Commission ("SEC") that recommends shareholders vote in favor of the

7    Proposed Transaction and adopt the Merger Agreement at the not-yet-scheduled shareholder

8    meeting.  The Proxy is materially deficient and deprives UNS's shareholders of the basic

9    information they require to make an intelligent, informed and rational decision to vote for or

10   against the Proposed Transaction.  The Proxy fails to disclose all material information

11   concerning the Proposed Transaction and contains additional materially misleading

12   statements.  As detailed below in ¶¶ 106-130, the Proxy omits and/or misrepresents material

13   information concerning, among other things: (a) the sales process for the Company; (b) the

14   data and inputs underlying the financial valuation analyses that purport to support the

15   fairness opinions provided by the Company's financial advisor, Lazard Frères & Co., LLC

16   ("Lazard"); and (c) the Company's financial projections.

17       11.    In endeavoring to sell the Company for less than fair value and pursuant to an

18   unfair process, defendants have breached their fiduciary duties of loyalty, due care,

19   independence, candor, good faith and fair dealing, and/or have aided and abetted such

20   breaches.  Moreover, the deal protection devices operate to block any other potential

21   acquirers, rendering unlikely any alternative proposals to acquire UNS.  Consequently,

22

1    judicial intervention is warranted here to rectify existing and future irreparable harm to the

2    Company's shareholders.    Plaintiff seeks equitable relief only to enjoin the Proposed

3    Transaction unless and/or until the Individual Defendants cure this breach of fiduciary duty.

4                                              **PARTIES**

5              12.    Plaintiff, a citizen of New York, is, and has been at all relevant times, the

6    owner of common stock of UNS.

7              13.    UNS is a corporation organized and existing under the laws of the State of

8    Arizona.  It maintains its principal executive offices at 88 E. Broadway Boulevard, Tucson,

9    AZ 85701.

10             14.    Paul J. Bonavia ("Bonavia"), a citizen of Arizona, has served as Chairman of

11   the Board and Chief Executive Officer of UNS and TEP since January 2009.  Bonavia also

12   served as President of UNS and TEP from January 2009 to December 2011.  Prior to joining

13   UNS, Bonavia served as President of the Utilities Group of Xcel Energy and also served as

14   President of Xcel's Commercial Enterprises business unit and Energy Market unit.

15             15.    David G. Hutchens ("Hutchens"), a citizen of Arizona, has served as the

16   President of UNS and TEP since December 2011 and as a member of the Board since 2013.

17   Hutchens previously served as the Executive Vice President of UNS and TEP from March

18   to December 2011, as Vice President of Energy Efficiency and Resource Planning from

19   May 2009 to March 2011, and as Vice President of Wholesale Energy at UNS and TEP

20   from January 2007 to May 2009.  Hutchens joined TEP in 1995.

21

22

16.     Lawrence J. Aldrich ("Aldrich"), a citizen of Arizona, has served on the Board since 2000.  Aldrich is also the Chairman and Executive Director of the Arizona Business Coalition on Health, a position he has held since October 2011.

17.     Barbara M. Baumann ("Baumann"), a citizen of Colorado, has served on the Board since 2005.   Baumann is the President and Owner of Cross Creek Energy Corporation, a management consultant and investor company specializing in the oil and gas sector.

18.     Larry W. Bickle ("Bickle"), a citizen of Texas, has served on the Board since 1998.  Bickle is also a director of SM Energy Company, an oil and gas production company.

19.     Robert A. Elliot ("Elliott"), a citizen of Arizona, has served on the Board since 2003.  Elliot is also the President and owner of Elliott Accounting, an accounting, tax, management, and investment advisory firm.

20.     Louise L. Francesconi ("Francesconi"), a citizen of Arizona, has served on the Board since 2008.

21.     Joaquin Ruiz ("Ruiz"), a citizen of Arizona, has served on the Board since 2005.  He is also a professor of geosciences at the University of Arizona.

22.      Gregory P. Pivirotto ("Pivirotto"), a citizen of Arizona, has served on the Board since 2008.   Pivirotto is also an adjunct professor at the University of Arizona College of Law.

23.     Ramiro G. Peru ("Peru"), a citizen of Arizona, has served on the Board since 2008.

1    24.    Daniel W. Fessler ("Fessler"), a citizen of California, has served on the Board

2    since 2005.

3    25.    FortisUS is a Delaware corporation and is a wholly-owned subsidiary of

4    Fortis.

5    26.    Merger Sub is an Arizona corporation and a wholly-owned subsidiary of

6    FortisUS.

7    27.    Fortis is a publicly traded holding company existing under the laws of

8    Newfoundland and Labrador, Canada.  Fortis's principal place of business is the Fortis

9    Building, Suite 1201, 139 Water Street, St. John's, Newfoundland, NL A1B.  Fortis is

10   traded on the Toronto Stock Exchange under the symbol FTS.

11   **JURISDICTION AND VENUE**

12   28.    The Court has subject matter jurisdiction over this action.  As alleged above in

13   paragraphs 10 through 25, Plaintiff is a citizen of New York and defendants are all citizens

14   of other states; and the amount in controversy exceeds $75,000.  In addition, the Court has

15   subject matter jurisdiction over Plaintiff's claims pursuant to sections 14(a) and 20(a) of the

16   Exchange Act and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

17   29.    The Court has personal jurisdiction over all the parties to this lawsuit.

18   Plaintiff submits to the jurisdiction of this Court and the defendants are all either citizens of

19   Arizona or have purposefully availed themselves to the benefits and protections offered by

20   the forum state.

21

22

30.     Venue is properly situated in this District.  UNS is both incorporated and maintains its corporate headquarters in this district, many of the defendants are citizens of Arizona, and many of the facts and circumstances giving rise to this action took place in this District.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

31.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other shareholders of UNS and owe Plaintiff and the other members of the Class (defined herein) the duties of good faith, fair dealing, loyalty and full and candid disclosure.

32.     By virtue of their positions as directors and/or officers of UNS, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause UNS to engage in the practices complained of herein.

33.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to obtain adequate value for shareholders and its constituents rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the shareholders to make an informed voting decision.  To diligently comply with this duty, the directors of a corporation may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     contractually prohibits them from complying with or carrying out their fiduciary duties;

(c)     discourages or inhibits alternative offers to purchase control of the corporation or its assets;

(d)     will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

34.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiff and the other shareholders of UNS, including their duties of loyalty, good faith and independence, insofar as they, *inter alia*, engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiff or the other shareholders of UNS common stock.

**CLASS ACTION ALLEGATIONS**

35.     Plaintiff brings this action for himself and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all owners of UNS common stock as of December 11, 2013, the date UNS and Fortis announced the Proposed Transaction (the "Class"). Excluded from the Class are Defendants and their affiliates, immediate families, legal

1  representatives, heirs, successors, or assigns and any entity in which Defendant have or had

2  a controlling interest.

3       36.    The Class is so numerous that joinder of all members is impracticable.  While

4  the exact number of Class members is unknown to Plaintiff at this time and can only be

5  ascertained through discovery, Plaintiff believes that there are thousands of members in the

6  Class.  According to the Proxy, as of January 16, 2014, UNS has approximately 41 million

7  shares of UNS common stock outstanding.  All members of the Class may be identified

8  from records maintained by UNS or its transfer agent and may be notified of the pendency

9  of this action by mail, using forms of notice similar to that customarily used in securities

10  class actions.

11       37.    Questions of law and fact in common to the Class include, *inter alia*, the

12  following:

13       (a)    Whether the Individual Defendants breached their fiduciary duties of

14  undivided loyalty or due care with respect to Plaintiff and the other members of the Class in

15  connection with the Proposed Transaction;

16       (b)    Whether the Individual Defendants breached their fiduciary duty to

17  secure and obtain the best price reasonably available under the circumstances for the benefit

18  of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

19       (c)    Whether Fortis, FortisUS, and the Merger Sub aided and abetted the

20  Individual Defendants' breaches of fiduciary duty;

21

22

1             (d)     Whether the Individual Defendants violated the federal securities laws;

2  and

3             (e)     Whether Plaintiff and the other members of the Class would be

4  irreparably harmed if the transactions complained of herein were consummated.

5       38.     Plaintiff's claims are typical of claims of the other members of the Class.

6  Plaintiff and the other members of the Class have sustained damages as a result of

7  Defendants' wrongful conduct as alleged herein.

8       39.     Plaintiff is committed to prosecuting this action, will fairly and adequately

9  protect the interests of the Class, and has no interests contrary to or in conflict with those of

10  the Class that Plaintiff seeks to represent.

11       40.     The prosecution of separate actions by individual members of the Class would

12  create the risk of inconsistent or varying adjudications for individual members of the Class

13  and of establishing incompatible standards of conduct for the parties opposing the Class.

14       41.     Conflicting adjudications for individual members of the Class might, as a

15  practical matter, be dispositive of the interests of the other members not parties to the

16  adjudications or substantially impair or impede their ability to protect their interest.

17       42.     Defendants have acted on grounds generally applicable to the class, making

18  appropriate final injunctive relief with respect to the Class as a whole.

19

20

21

22

1

**FURTHER SUBSTANTIVE ALLEGATIONS**

2

*Company Background and its Poise for Growth*

3      43.      UNS was founded in 1902 in Tucson, Arizona.   Formerly known as

4    UniSource Energy Corporation, UNS is a utility services holding company engaged,

5    through its subsidiaries, in the generation and distribution of electricity.

6      44.      UNS wholly owns four of its subsidiaries, TEP, UES, Millennium Energy

7    Holdings, Inc. ("Millennium"), and UniSource Energy Development Company ("UED").

8      45.      TEP generates, transmits, and distributes electricity to approximately 406,000

9    retail customers in a 1,155 square mile area of southeastern Arizona.   TEP's customers are

10   residences, business, industries, and the government.   It sells some of the electricity it

11   generates to other utilities in the western United States.   As of December 31, 2012, TEP

12   owned or leased 2,267 megawatts of net generating capacity, as well as owned or

13   participated in an electric transmission and distribution system consisting of 564 circuit-

14   miles of 500 kV lines, 1,088 circuit-miles of 345-kV lines, 405 circuit-miles of 138-kV

15   lines, 481 circuit-miles of 46-kV lines, and 2,612 circuit miles of lower voltage primary

16   lines.   TEP also operates the Springerville Generating Station Unit 3 on behalf of the Tri-

17   State Generation and Transmission Association, Inc. and the Springerville Unit 4 on behalf

18   of the Salt River Agriculture Improvement and Power District.

19      46.      UNS holds some of the common stock of two other regulated public utilities,

20   UNS Gas, Inc. and UNS Electric, Inc.   UNS Gas is a gas distribution company, which

21   serves approximately 149,000 customers in Mohave, Yavapai, Coconino, Navajo, and Santa

22

1  Cruz counties.  UNS Electric is a public utility, which generates, transmits, and distributes

2  electricity to approximately 92,000 customers in Mohave and Santa Cruz counties.

3        47.    Both Millennium and UED focus on the unregulated aspects of the energy

4  market.  Their investments in this segment represented less than one percent of UNS's

5  assets as of December 31, 2012.

6        48.    Though UNS's financial results for the 2012 fiscal year did not compare

7  favorably with its results for 2011, these results were due to temporary setbacks and

8  unforeseen circumstances rather than structural weaknesses in UNS's business model.

9        49.    On February 26, 2013, UNS issued a press release announcing the Company's

10  fiscal year 2012 earnings, reporting net income of $90.9 million in 2012, or $2.20 per

11  diluted share as compared to net income of $110.0 million, or $2.75 per diluted share, in

12  2011.

13        50.    On that same day, UNS executives held an earnings call to explain why the

14  financial results for the 2012 fiscal year were down when compared to the financial results

15  for the 2011 fiscal year.  In this regard, Bonavia described an "unplanned outage" that TEP

16  experienced at Springerville Unit 3:

17          TEP operates that unit on behalf of Tri-State, and we can earn operating fees
            and performance bonuses for doing so.  That outage caused TEP to miss
18          certain performance targets in 2012.  As a result, 2012 earnings per share
            reflect a reduction of approximately $0.05 per diluted share.
19

20        51.    Bonavia also discussed a partial write-off that UNS made in relation "to a

21  proposed transmission project," which reduced 2012 diluted earnings per share by

22  approximately $0.07."  The write-off "was occasioned by the likelihood that [UNS] will

-14-

abandon the project as well as a provision in TEP's pending rate case settlement agreement regarding recovery of cost related to that project.

52.     Bonavia further explained that 2011's earnings also included a one-off "gain of approximately $0.11 per diluted share related to the settlement of a transmission dispute" with another electric company.  In sum, excluding these three items, "earnings for 2012 were approximately $2.32 per diluted share compared with $2.64 in 2011."

53.     During the February 26, 2012 call, Bonavia flagged a "few of [UNS's] notable achievements" for the 2012 fiscal year.  In particular, he stated that:

> We once again delivered earnings within our stated guidance range.  The effects of slow economic recovery, energy efficiency and distributed generation on our retail energy sales as well as an outdated retail rate structure and TEP created significant challenges in 2012.  We responded to the ongoing pressure on margins by identifying operating efficiencies and process improvements.

54.     The "outdated retail rate structure" to which Bonavia referred is a settlement entered into by TEP and the Arizona Corporate Commission (the "ACC") in 2008.  The ACC is the Arizona public agency that is responsible for granting or denying utility rate adjustments.  According to a May 29, 2008 press release issued by UNS, TEP and the ACC "agreed to a settlement that would increase [TEP's] base rates by approximately 6 percent beginning no later than Jan. 1, 2009."  After that increase, TEP could not raise its rates again until 2013 at the earliest.

55.     Further underlining the temporary nature of the setback that the Company experienced in 2012, UNS has been performing well over the course of the 2013 fiscal year. In an April 29, 2013 press release, the Company announced its earnings for the first quarter

-15-

1    of 2013.  UNS's net income for this quarter was $11.3 million, or $0.27 per diluted share of

2    common stock.  This compares to a net income of $6.5 million, or $0.17 per diluted share, in

3    the first quarter of 2012.  TEP also reported good results for the quarter.  TEP had a net

4    income of $1.5 million compared with a net loss of $1.5 million in the first quarter of 2012.

5         56.     On July 30, 2013, UNS issued a press release announcing the Company's

6    second quarter 2013 financial results, reporting net income for the second quarter of $34.6

7    million, or $0.83 per diluted share as compared to net income of $26.3 million, or $0.64 per

8    diluted share, in the second quarter of 2012.  For the six months ended July 30, 2013, UNS

9    reported net income of $40.6 million, or $1.10 per diluted share, compared with $32.7

10   million, or $0.81 per diluted share, in the same period in 2012.

11        57.     UNS also released TEP's second quarter earnings on July 30, 2013, reporting

12   net income of $30.8 million, as compared with a net income of $21.9 million in 2012.

13        58.     In the same press release, the Company announced that the ACC approved

14   new rates for TEP.  The new rates, which were the product of negotiations between the

15   Company and the ACC that began in the first quarter of 2013, became effective on July 1,

16   2013.  The rates "include[d] TEP's first base rate increases since 2008."  Bonavia

17   commented on the importance of the new rates in the press release, stating that, "[UNS's]

18   second quarter results mark the end of a four and a half year base rate freeze at TEP.  The

19   rate freeze, coupled with little to no economic growth, created significant challenges during

20   this period."  He continued, "TEP's new retail rates promote stability and strengthen TEP's

21

22

1   financial position, bolstering our ability to make long-term investments that are in the best

2   interests of our customers."

3        59.    Bonavia also spoke about the importance of the rate increase in a conference

4   call with investors that accompanied the release of the second quarter 2013 earnings.  He

5   stated:

6          The approval of TEP's new rates by the [ACC] in June, fairly balances the
       needs of our customers with the long term financial stability of TEP.  TEP's
7          new rate structure which became effective July 1, contains a modest increase
       of less than $4 per months [sic] for the average residential customer.  It has
8          new cost recovery mechanisms that help to mitigate regulatory lag, and our
       reiteration and rate design changes that give our customers easier to
9          understand rate options and stabilize our ability to recover fixed cost.

10        60.    In addition, Bonavia mentioned certain changes to UNS's market that would

11   greatly benefit the Company.  Specifically, he said:

12          Earlier this month Augusta Resources announced that it's in the final
       permitting stages for the Rosemont Copper mine.  The remaining permits
13          include getting the final environmental impacts statement and record of
       decision from the U.S. force service as well as section 404 water permit from
14          the army core of engineers.  Augusta estimates that it can start mine
       construction later this year and begin production in 2015.
15

16          Once in full production Rosemont would become based on current estimates
       TEP's largest customer with an estimated load of 85 megawatts.  Turning to
       Tucson housing market, June closings were 9% above last year, the median
17          price of homes sold increased by 15%.  In June university of Arizona's
       economic research center updated their economic forecast for Tucson, they
18          still call for the recovery to gain traction later in 2013 and for accelerated
       growth in 2014 and '15.
19

20        61.    During the same conference call, Kevin Larson ("Larson")—the Company's

21   Senior Vice President and Chief Financial Officer—also discussed the impact that the

22   Rosemont mine would have on the Company's revenues.  He stated that UNS has the

"capacity to serve Rosemont, we don't have to go build something or buy something, so the revenue effect kicks right in."

62.     On the call, Bonavia also commented on why he thought that the Company was well-positioned for future growth.  He stated that:

> I like the way our [investment path] curve looks as we've disclosed it in that, we are adding the rate base but we're adding at a nice manageable moderate financeable pace and our rate base investment is spread across the value change that we don't have single big investments that bring high risk or political controversy or for some other reason have a bull's eye painted on them.
>
> So we have a nice measure but increasing base investment, we have a spread around the value chain which reduces the risk of rate base growth and then we have layered on top of that question of what asset mix we're going to pick up [going forward] and that one is where the highest level of uncertainty is right now because we are right in the thick of those decisions today.  So what does that translate into for an earnings path?  We will give you the drivers and the sensitivity factors but it's a pretty reasonably predictable operating path over the next few years.  We expect some modest sales growth particularly if the economy behaves the way the economists say it will.  We've got the TEP rate case in effect.  We may well have new rates in effect for UNS Electric which will perhaps contribute some additional growth.  We will keep you posted on that.  We have the steady rate base growth and all the pieces are there.

63.     On November 6, 2013, the Company issued a press release announcing its third quarter 2013 earnings.  As with the previous two quarters, the Company's income in the third quarter was higher in 2013 than it was in 2012.  Specifically, UNS's net income for the third quarter 2013 was $68.0 million, or $1.62 per diluted share of common stock, compared with net income of $50.7 million, or $1.21 per diluted share, in the third quarter of 2012.  For the nine months that ended September 30, 2013, UNS's net income was

1  $114.0 million, or $2.72 per diluted share, compared with $83.4 million, or $2.03 per

2  diluted share, in the same period in 2012.

3      64.    TEP's income was also up in the third quarter of 2013.  TEP reported net

4  income of $64.2 million in that quarter, compared with net income of $44.6 million in the

5  third quarter of 2012.

6      65.    UNS also provided guidance for 2014 in the November 6 press release.  UNS

7  stated that it expects its diluted earnings per share to be between $3.15 and $3.45 in 2014,

8  which compared to projected diluted earnings per share of $2.95-$3.10 for 2013.  The

9  release quoted Bonavia as saying that UNS's "financial outlook for 2014 reflects a full year

10  of TEP's new retail rate structure and a reduction in TEP's capital lease expenses."  Bonavia

11  also stated that UNS "project[ed that its] 2015 diluted earnings per share [would] be above

12  2014 levels."

13      66.    Further, UNS used the November 6 press release to announce a number of key

14  acquisitions by TEP.  First, TEP decided "to purchase approximately 35.4 percent of the

15  output of the coal-fired Springerville Generating Station Unit 1 [ ].  TEP currently receives

16  all of the output from the 387 megawatt (MW) facility through a 14.1 percent ownership and

17  leases for the remainder.  The planned purchase of 35.4 percent of [the Spingerville Unit]

18  would bring TEP's ownership to approximately 49.5 percent when the current leases expire

19  on January 1, 2015."

20      67.    Second, TEP announced that "it [was] in exclusive negotiations to purchase a

21  550 MW gas-fired combined-cycle generating unit at the Gila River Generating Station

22

(Gila River) in Gila Bend, Ariz." TEP estimated that the purchase would be finalized in late 2014.

68.    UNS's executive expounded upon some of the information provided in the November 6 press release in an accompanying conference call with investors. For example, Bonavia explained why he believed that the Company would grow in 2014 and 2015. He stated:

> The successful execution of our long-term resource strategy, the continued reduction in TEP's capital lease expense and the new and pending rate structures at TEP and UNS Electric, give us confidence that we can grow earnings over the next two years in spite of various cost pressures.

69.    Bonavia also reported that TEP was "making significant progress toward diversifying [its] generating fuel mix. During the third quarter, [TEP] committed to purchase approximately 35% of the capacity of Springerville Unit 1 that is currently leased by TEP. TEP will pay approximately $65 million or $478 per kilowatt for ownership of 137 megawatt of continuous operating capability." Bonavia continued, "[a]nother important component of [TEP's] resource strategy is the San Juan Generating Station. In September, the New Mexico Environmental Improvement Board approved the current plant that would lead to the retirement of San Juan Units 2 and 3 by the end of 2017, as well as the installation of selective non-catalytic reduction or SNCR technology on Units 1 and 4 by early 2016."

70.    According to Bonavia, the Gila River facility will provide UNS "with [more] flexibility to meet peak demand and integrate cost effective renewable resources into [its] system."

-20-

71.     Yet, rather than permitting the Company's shares to trade freely and allowing its public stockholders to reap the benefits of the Company's increasingly positive long-term prospects, the Individual Defendants have acted for their personal benefit and the benefit of Fortis, and to the detriment of the Company's public stockholders by entering into the Merger Agreement.

***The Proposed Transaction is the Product of a Flawed Process that Provides Unique Material Benefits to Certain UNS Directors and Officers Not Available to the Company's Public Shareholders***

72.     Rather than negotiate a transaction that was in the best interest of UNS's public shareholders, the conflicted Board and senior management disloyally put their own financial interests ahead of those of the Company's shareholders and steered a transaction towards Fortis *via* an insufficient process, in breach of their fiduciary duty to maximize shareholder value.

73.     Fortis began its pursuit of UNS in September of 2011, when a representative of Scotiabank contacted defendant Bonavia to arrange a meeting between himself and his CEO counterpart at Fortis, H. Stanley Marshall.  At this meeting, defendant Bonavia learned a vital piece of information related to Fortis' takeover plans – Fortis only wanted to acquire companies with management teams that could be left in place following the merger.  Armed with this knowledge of continued employment for himself and the other members of the Company's senior executive management, defendant Bonavia took the potential transaction to the Company's board of directors, who determined that it was not the appropriate time to pursue a strategic transaction in light of the Company's then-current business focus.

1    Defendant Bonavia and Mr. Marshall remained in contact, however, and in the spring of

2    2012, Marshall, along with Barry V. Perry, Fortis' Vice President and Chief Financial

3    Officer, paid a visit the Company's offices to view UNS's business and operations.

4         74.    An acquisition by Fortis was never far from the Board's collective mind,

5    however, as the Individual Defendants internally discussed a strategic transaction at its

6    September 18, 2012 board strategy session.  At this meeting, the Board concluded that it

7    would be willing to consider a potential transaction, but that it was not the appropriate time

8    to enter into such a transaction, instead reaffirming its pursuit of success as a standalone

9    company.

10        75.    In mid-2013, UNS was approached by a utility company on the east coast of

11   the United States that indicated it wanted to discuss a potential merger of equals transaction.

12   Defendant Bonavia met with a representative of this company and reported to the Board,

13   who inexplicably halted any further conversation about a deal because of an unexplained

14   perception that the deal would not result in a premium to Company shareholders.

15        76.    Later in 2013, a different company approached UNS about a potential

16   combination, stating its interest, but that it would not be in a position to effectuate a merger

17   until sometime in 2014.

18        77.    In July of 2013, a representative of an investment fund expressed interest in

19   discussing a potential acquisition of UNS to defendant Bonavia. Bonavia brought this

20   proposition to the Board in early August of 2013, at which point it determined that it was

21   not prepared to deviate from its stand-alone strategic plan for the Company and its

22

shareholders, but that it would be useful to conduct some sort of market check to gain a better understanding of the true value of the Company vis-à-vis a potential sale.

78.     Rather than reasonably inform itself as to the nature of the investment fund's interest to determine whether a transaction with it would provide greater shareholder value,, the Board inexplicably determined that it "would make more sense" to discuss a transaction exclusively with Fortis to the exclusion of the investment fund and other companies that had recently made their interest in the Company known.

79.     The Proxy fails to address the key element that Bonavia and the Individual Defendants knew about a potential deal with Fortis that they did not know about one with an investment fund – Fortis' federation business model would leave much of the senior management and the Board in place.  Armed with this knowledge and self-interest, the Board sought to insulate themselves and the Company by only seeking a deal with Fortis and eschewing any competitive bidding process.

80.     Defendant Bonavia reached out to Fortis in early September 2013, making it known that UNS was interested in revisiting their previous discussions about an acquisition by Fortis.  On October 1, 2013, representatives of both companies met and UNS provided Fortis with certain business plans and financial forecasts.

81.     Also in early October 2013, the Company engaged Lazard as its financial advisor to advise on a potential deal with Fortis, a party Lazard knew well based on its recent experience of advising CH Energy Group, Inc., a utility company that had recently been acquired by Fortis.  Importantly, Lazard was not authorized to and did not contact any

1   other parties about a potential transaction with UNS, as is common in a competitive sales

2   process.

3      82.   At an October 3, 2013 Board meeting, the Individual Defendants discussed the

4   future for UNS as a standalone company and the attractiveness of an acquisition by Fortis.

5   They again pointed to the likelihood of a deal gaining regulatory approval, in addition to

6   Fortis' maintaining of local management and headquarters as favorable, particularly in light

7   of the $57.00 per share preliminary indication of interest made by Fortis earlier in the day.

8      83.   With Fortis' preliminary indication of interest in its back pocket, the

9   Individual Defendants could have sought to reasonably inform themselves of the value of

10  the Company by contacting any of the previous parties that had also shown interest in the

11  Company (aside from the July 2013 investment fund, UNS had fielded inquiries from

12  several other parties, including other investment funds as well as from five utility companies

13  other than Fortis since 2010) or instructing Lazard to gauge open market interest in the

14  Company.   It did neither, instead choosing to continue in bilateral discussions with its

15  preferred acquirer, Fortis, the entity it perceived to be most able to provide liquidity for their

16  otherwise illiquid assets and which was most likely to keep senior management and certain

17  Board members in place after cashing out Company shareholders.

18     84.   Over the next two months, UNS and Fortis continued negotiating a potential

19  deal, particularly a plan for regulatory approval, while also engaging in due diligence.  The

20  Individual Defendants remained steadfast in their stance related to only engaging Fortis and

21  reaffirmed its decision to not seek proposals from other companies.

22

85.     On December 11, 2013, the UNS Board met telephonically and unanimously determined to adopt the proposed merger agreement and recommend that UNS shareholders do the same.

86.     The insufficient process, which had been nothing but a fabrication designed to mask the intended acquisition of the Company by Fortis, was finally over.  After months of engaging Fortis and only Fortis and with no reasonable market check to determine if the price paid to UNS shareholders was adequate, the Board determined to end UNS' century-long existence.

87.     While UNS's shareholders will be fleeced of their holdings in the Company, UNS's executive officers and directors stand to receive a windfall that they would not otherwise enjoy if the Company were to remain a standalone entity.  As illustrated below, the golden parachutes for the executive officers of UNS are sizeable.

**Change of Control and Termination Compensation**

| Named Executive Officer | Cash ($) (1) | Equity ($)(2) | Pension/NQDC ($) | Perquisites/Benefits ($)(3) | Tax Reimbursement ($)(4) | Other ($) | Total($) |
|---|---|---|---|---|---|---|---|
| Paul J. Bonavia | 2,844,022 | 2,834,160 | -- | 11,826 | -- | -- | 5,690,008 |
| David G. Hutchens | 1,097,810 | 1,355,625 | -- | 25,629 | -- | -- | 2,479,064 |
| Kevin P. Larson | 970,896 | 1,028,468 | -- | 3,264 | -- | -- | 2,002,628 |
| Philip Dion | 514,744 | 219,310 | -- | 31,184 | -- | -- | 765,238 |
| Michael J. DeConcini | -- | 1,076,574 | -- | -- | -- | -- | 1,076,574 |
| Karen G. Kissinger | 488,068 | 801,928 | -- | 22,201 | -- | -- | 1,312,197 |

88.     Additionally, as a result of the Proposed Transaction, Company stock options and restricted shares will no longer be subject to their restrictions and will become fully redeemable for the stated merger consideration, thus resulting in a substantial financial boon

-25-

for the Individual Defendants and senior management that would not exist had the Company continued as an independent entity.

| | Directly Owned Shares | Shares Purchased Under 401(k) Plan | Shares Subject to Options Exercisable Within 60 Days | Restricted Stock Units | Deferred Shares | Total Number of Shares Eligible for Merger Consideration | Cash Consideration to be Received |
|---|---|---|---|---|---|---|---|
| Paul J. Bonavia | 43,024 | 0 | 59,940 | 0 | 679 | 103,646 | $6,244,671.50 |
| Lawrence J. Aldrich | 3,912 | 0 | 0 | 14,669 | 0 | 18,581 | $1,119,505.25 |
| Barbara M. Baumann | 2,000 | 0 | 0 | 12,943 | 14,177 | 29,120 | $1,754,480.00 |
| Larry W. Bickle | 10,195 | 0 | 0 | 13,519 | 0 | 23,714 | $1,428,768.50 |
| Robert A. Elliott | 4,068 | 0 | 0 | 13,312 | 0 | 17,380 | $1,047,145.00 |
| Daniel W.L. Feddler | 2,511 | 0 | 0 | 19,222 | 0 | 21,733 | $1,309,413.25 |
| Louise L. Francesconi | 3,000 | 0 | 0 | 8,130 | 0 | 11,130 | $670,582.50 |
| Ramiro G. Peru | 4,000 | 0 | 0 | 10,091 | 0 | 14,091 | $848,982.75 |
| Gregory A. Pivirotto | 8,500 | 0 | 0 | 10,091 | 0 | 18,591 | $1,120,107.75 |
| Joaquin Ruiz | 300 | 0 | 0 | 12,943 | 0 | 13,243 | $797,890.75 |
| David G. Hutchens | 5,335 | 8,341 | 27,330 | 0 | 0 | 41,006 | $2,470,611.50 |
| TOTAL | 86,845 | 8,341 | 87,270 | 114,920 | 14,856 | 312,235 | $18,812,158.75 |

89.     Furthermore, according to the Proxy, four of the eleven members of the UNS Board, including CEO and steward of the sales process defendant Bonavia, may remain on the post-merger Board. Additionally, it is expected that UNS's executive officers (which would include defendant Hutchens) will continue with the Company post-merger. The benefit of continued employment is certainly not one shared by the Company's shareholders. As the prospect of such employment was known by defendants Bonavia and the other Individual Defendants early on during the negotiation process, they slanted all negotiations towards Fortis.

90.     The Individual Defendants agreed to the Proposed Transaction in breach of their fiduciary duties to UNS's public shareholders, which they brought about through an unfair sales process. Rather than undertake a full and fair sales process designed to maximize shareholder value, as required by their fiduciary duties, the Board catered to its

1  own liquidity goals and aspirations for continued employment, as well as to the interests of

2  Fortis.

3       91.    Simply put, the Proposed Transaction is the product of a fundamentally flawed

4  process that is designed to unlawfully divest UNS's public shareholders of their equity

5  holdings in exchange for inadequate merger consideration and end the Company's

6  independent existence.  Defendants know UNS will continue to produce substantial revenue

7  and earnings for Fortis, yet have engaged in a flawed sales process void of any market check

8  that detrimentally leaves the minority public shareholders of UNS with less than adequate

9  consideration, guaranteeing that they will not enjoy the future financial success of the

10  Company they have loyally invested in.  Herein, Plaintiff alleges that the Proposed

11  Transaction is being accomplished by deception, illegality, and in breach of defendants'

12  fiduciary duties.

13  ***Defendants Announce the Unfair Proposed Transaction for Inadequate Consideration***

14       92.    In a press release dated December 11, 2013, the Company announced that it

15  had entered into a merger agreement with Fortis.  Under the terms of the Merger

16  Agreement, Fortis will acquire all of UNS's outstanding common stock for $60.25 per share

17  in cash.  The Proposed Transaction is valued at $4.3 billion and includes the assumption by

18  Fortis of UNS's approximately $1.8 billion in debt.

19       93.    Given the Company's recent performance and its positioning for growth, the

20  consideration provided under the Proposed Transaction is unfair and undervalues the

21  Company.

22

94.     As detailed extensively above, UNS's growth prospects are very good.  The Company recently negotiated a deal with the ACC that allows the Company to raise its base rates on its customers.  This is a significant development for the Company.  For the first time since 2008, UNS is allowed to raise its rates to take into account the very different economic climate that it faces now than it faced in 2008.

95.     Further, UNS, through its TEP subsidiary, has taken substantial steps to diversify its energy production abilities.  For example, in the third quarter of 2013 alone, UNS announced that TEP purchased an additional 35.4% of the Springerville Generating Station Unit 1, increasing its ownership stake by 21.3%.  TEP also entered into negotiations to purchase all of a gas-fired combined-cycle generating unit in Gila Bend, Arizona.  Finally, TEP received a series of key permits that are necessary to its plan to bring online the new San Juan Generating Station.

96.     UNS is also well-positioned to take advantage of the improving economic climate in Arizona.  UNS emphasized repeatedly that Arizona's economic recovery is predicted to gain traction in 2013 and accelerate even more in 2014 and 2015.  As the regional economy continues to grow, demand for energy will increase.  That demand will result in increased revenue for UNS.  An example of the growth in the regional economy is the development of the Rosemont Copper mine.  If the mine starts operating, it will be UNS's single biggest client.

97.     UNS's beneficial positioning is evidenced by the fact that even when the economy remained weak, such as in 2012, the Company continued to perform well.  In

1    2012, as in previous years, the Company delivered earnings within its stated guidance range.

2    UNS would not have been able to do that had its fundamentals not been strong.  These

3    fundamentals will serve the Company well as the economy of Arizona continues to improve

4    over the course of the next few years.

5         98.     In addition, the Proposed Transaction consideration fails to adequately

6    compensate UNS's shareholders for the significant synergies created by the merger.  Fortis

7    stands to absorb one of the major utilities providers in Arizona, supplementing its growing

8    American holdings and adding to its current multi-national business portfolio.  As stated by

9    UNS CEO Marshall in the press release announcing the Proposed Transaction, "[t]he

10   acquisition is expected to be ***accretive to EPS the first year of closing***, including one-time

11   acquisition-related expenses." (emphasis added).  In exchange for losing their stake in the

12   Company to Fortis, which will instantly benefit from the acquisition, UNS shareholders will

13   be completely frozen out of any profit the Company may enjoy in the future.

14        99.     Exacerbating matters, under § 3.30 of the Merger Agreement, UNS

15   stockholders have no dissenters' or appraisal rights, thereby preventing them from obtaining

16   "fair value" for their shares pursuant to an appraisal proceeding.

17   ***Defendants Agreed to Preclusive Deal Protection Provisions***

18        100.    The Proposed Transaction is also unfair because as part of the Merger

19   Agreement, Defendants agreed to certain onerous terms and preclusive deal protection

20   devices that operate to make the Proposed Transaction a *fait accompli* and ensure that no

21   competing offers will emerge for the Company.

22

1    101.   Specifically, § 5.4 of the Merger Agreement includes a "no solicitation"

2    provision barring the Company from soliciting interest from other potential acquirers in

3    order to procure a price in excess of the amount offered by Fortis.   According to this

4    Section, the Company

> shall not, and shall cause [its subsidiaries] not to, and shall not authorize or
> permit any of its officers, directors, or employees to, and shall instruct [its
> directors, officers, employees, accountants, consultants, legal counsel,
> advisors, agents, and other representatives (the "Representatives")] not to on
> behalf of the Company, directly or indirectly, (i) initiate, solicit or knowingly
> encourage or facilitate the submission of any [merger proposal], or any inquiry
> or proposal that could reasonably be expected to lead to a[ merger proposal],
> or (ii) participate in any discussions or negotiations with any person, or
> furnish to any person any information, with respect to a[ merger proposal], or
> any inquiry or proposal that could reasonably be expected to lead to a[ merger
> proposal]. The Company shall, and shall cause [its subsidiaries] and the
> [Representatives] to, immediately cease and cause to be terminated any
> discussion or negotiation with any Persons conducted prior to the date hereof
> by the Company, [its subsidiaries] or any of the [Representatives] with respect
> to any [merger proposal].

13    102.   Section 5.4(c) of the Merger Agreement also contains a "matching rights"

14    provision, whereby the Company must promptly notify Fortis within one business day

15    should it receive an unsolicited competing merger proposal.   The provision states that the

16    Company

> shall as promptly as reasonably practicable (and in any event within one (1)
> Business Day) notify [FortisUS] in writing in the event that the Company
> receives any written [outside merger proposals], including the material terms
> and conditions of such [merger proposal], or any inquiry that would
> reasonably be expected to lead to a[ merger proposal]. The Company shall (i)
> keep [FortisUS] informed, in all material respects, on a reasonably prompt
> basis, of the status, and details of any such [merger proposal] (including any
> change to the material terms and conditions thereof) and (ii) provide to
> [FortisUS] as soon as reasonably practicable (and in any event within one (1)
> Business Day and at least one (1) Business Day prior to making any

-30-

determination with respect to such [merger proposal]) after receipt or delivery thereof copies of all written material (including draft agreements) specifying the material terms and conditions of such [merger proposal] exchanged between the Company, [its subsidiaries] or the [Representatives], on the one hand, and the Person making such [merger proposal] (or its representatives), on the other hand.

103.    The Merger Agreement also provides that a termination fee of approximately $63,900,000 must be paid to Fortis by UNS if UNS decides to pursue the competing offer. The substantial termination fee will ensure that no competing offer will appear, as any competing offer would essentially pay a premium for the right to provide the shareholders with a superior offer.

104.    Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The narrow circumstances under which the Board may respond to alternative proposals and the Company's inability to terminate the Merger Agreement if it accepts a superior proposal fail to provide an effective "fiduciary out" under the Merger Agreement.  The circumstances under which the Board may respond to an unsolicited, written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

105.    Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

1    ***The Materially Misleading And/Or Incomplete Proxy***

2        106.    In order to secure shareholder approval of this unfair deal, On January 22,

3    2014, UNS and the Individual Defendants filed with the SEC the materially misleading and

4    incomplete Proxy in connection with the Proposed Transaction.  Compounding the defective

5    sales process utilized by the Individual Defendants, the Proxy fails to provide the

6    Company's stockholders with material information and/or omits material information

7    thereby precluding the stockholders from making a fully informed decision regarding the

8    upcoming vote on the Proposed Transaction.

9        107.    The Proxy fails to address the misstatements and omissions raised by Plaintiff

10   herein.  Specifically, the Proxy omits/or misrepresents the material information set forth

11   below in contravention of Sections 14(a) and 20(a) of the Exchange Act, rendering

12   shareholders unable to cast an informed vote on the Proposed Transaction.

13       108.    The omitted information described herein, if and when disclosed, would

14   significantly alter the totality of information available for consideration by the average UNS

15   shareholder.   Specifically, the Proxy fails to provide the Company's shareholders with

16   material information and/or provides materially misleading information regarding: (i) the

17   process leading to the Merger; (ii) the financial analyses performed by the Company's

18   financial advisor, Lazard; and (iii) the Company's financial projections.  As such, if UNS

19   shareholders vote based upon the inadequate Proxy, they will be irreparably harmed.

20       109.    In particular, the Proxy fails to fully and fairly disclose the following material

21   information about the process that led to the Merger:

22

-32-

1          (a)      Whether the east coast utility company that approached UNS in mid-

2    2003 to discuss a potential merger, a representative of which defendant Bonavia met with,

3    indicated a tentative offer price and, if not, how did the Board determine that such a

4    transaction was unlikely to provide UNS shareholders a premium;

5          (b)      Why did the Board of UNS believe Fortis, and only Fortis, was able to

6    provide value and benefits that no other party could match;

7          (c)       What were the potential advantages and disadvantages of a sale of

8    UNS generally, as well as a sale to Fortis specifically that were discussed by the Board in

9    early October 2013;

10         (d)      Why did the Board deem the use of leverage to finance an acquisition

11   of UNS by investment funds as a disqualifier when determining whether or not to open the

12   process up to alternative bidders aside from Fortis, yet supports the transaction with Fortis

13   being effectuated via borrowed funds;

14         (e)      As related to the analysis of other potential bidders for UNS presented

15   to the Board by Lazard at the October 27, 2013 Board meeting, what was the selection

16   criteria used to identify these bidders, how many were investment funds, as opposed to

17   strategic utility companies, and did this analysis include any of the entities that had

18   previously approached the Company about a potential acquisition.

19      110.   The omission of the above information makes the following information

20   material misleading:

21         (a)      On page 27 of the Proxy, the statement:

22

In mid-2013, UNS Energy was approached by a utility company on the east coast of the United States that indicated it wanted to discuss a potential merger of equals transaction. Mr. Bonavia met with a representative of the other company in Tucson, and reported to the UNS Energy board about the meeting. After discussing the matter, the board and UNS Energy management decided not to pursue the transaction because they did not believe that it was likely to provide an opportunity for UNS Energy shareholders to receive a premium for their shares and because they did not believe that the potential benefits of the transaction were sufficient to justify deviating from UNS Energy's stand-alone strategic plan.

(b)     On page 27 of the Proxy, the statement:

The board viewed the possibility of a transaction with Fortis as attractive because it could provide value for shareholders as well as benefits for local constituencies in a way that transactions with other companies that might be interested in a transaction with UNS Energy could not.

(c)     On page 30 of the Proxy, the statement:

Following these presentations, the board discussed, among other things, the potential advantages and disadvantages of a sale of UNS Energy generally as well as a sale to Fortis specifically.

(d)     On page 30 of the Proxy, the statement:

The board's decision to limit its negotiations to Fortis at that time was based on several factors. One factor was that the investment funds that had previously approached UNS Energy were likely to want to use leverage in a transaction and did not have extensive experience owning and managing integrated electric and gas utility companies.

As compared with page 58 of the Proxy, which states:

Fortis expects to fund the acquisition of UNS Energy using the Cdn$2.0 billion ($1.89 billion) non-revolving term acquisition credit facilities obtained on December 11, 2013 pursuant to a commitment letter from The Bank of Nova Scotia, an affiliate of Scotiabank, financial advisor to Fortis in connection with the merger.

-34-

1   (e) On page 31 of the Proxy, the statement:

> In addition, the board reviewed legal issues relating to a potential transaction with Baker Botts and received an updated financial report from Lazard. Lazard's presentation included analysis of other potential bidders for UNS Energy, what their ability to pay for UNS Energy might be, their level of strategic interest in making an acquisition of UNS Energy, and whether they would likely be able to offer cash or would more likely offer a significant portion of stock as the consideration in a transaction.

111. The above statements are rendered misleading by the omissions because they give a materially incomplete and misleading picture of the sales process, and in particular, fail to disclose all material facts necessary for shareholders to determine whether the Board carried out a full and fair sales process designed to maximize the sales price.

112. Additionally, the Proxy fails to disclose material information about the financial analyses performed by Lazard in rendering its fairness opinion.

113. The description of Lazard's *Selected Comparable Company Multiples Analysis* on pages 39-40 is materially misleading and deficient because it fails to disclose:

   (a) A valuation summary with UNS's fully diluted shares outstanding, cash, debt, equity value (at the unaffected price and the offer price), and enterprise value (at the unaffected price and the offer price);

   (b) The objective selection criteria used by Lazard to select the sample of public companies;

   (c) The selected companies' specific pricing multiples; and

   (d) The "other things" calculated and used by Lazard in its Comparable Company analysis, and whether additional pricing multiples were included in this catch-all.

114.   The omission of this information renders the following statements misleading:

(a)   On pages 39-40 of the Proxy:

*Selected Comparable Company Multiples Analysis*

Lazard reviewed and analyzed certain financial information, valuation multiples and market trading data related to selected comparable publicly-traded regulated utility companies whose operations Lazard believed, based on its experience with companies in the regulated utility industry, to be similar to UNS Energy's operations for purposes of this analysis. Lazard then compared such information to the corresponding information for UNS Energy.

The selected group of companies used in this analysis, which we refer to in this proxy statement as the UNS Energy comparable companies, was as follows:

- Avista Corporation
- El Paso Electric Company
- IDACROP, Inc.
- Pinnacle West Capital Corporation
- PNM Resources, Inc.
- Portland General Electric Company
- Teco Energy, Inc.

Lazard selected the companies reviewed in this analysis because, among other things, the UNS Energy comparable companies operate businesses similar to the business of UNS Energy. However, no selected company is identical to UNS Energy. Accordingly, Lazard believes that purely quantitative analyses are not, in isolation, determinative in the context of the merger and that qualitative judgments concerning differences between the business, financial and operating characteristics and prospects of UNS Energy and the UNS Energy comparable companies that could affect the public trading values of each also are relevant.

Lazard calculated and compared various financial multiples and ratios of each of the UNS Energy comparable companies, including, among other things:

- The ratio of each company's December 10, 2013 closing share price to its calendar year 2014 and 2015 estimated earnings per share, commonly referred to as "EPS";

-36-

- The ratio of each company's enterprise value, calculated as the market capitalization of each company (based on each company's closing share price as of December 10, 2013 and fully-diluted share count as of September 30, 2013), plus debt, less cash, cash equivalents, and marketable securities as of September 30, 2013, to its calendar year 2014 and 2015 estimated earnings before interest, taxed, depreciation and amortization, commonly referred to as "EBITDA."

115.   The description of Lazard's *Public Market Discounted Cash Flow Analysis* on pages 40-41 of the Proxy is materially misleading and deficient because it fails to disclose:

(a)   The definition of "unlevered free cash flow" used by Lazard;

(b)   The source, identity, and value of the assumptions used to derive the unlevered free cash flows from the projections provided by management;

(c)   The identity, quantity, and source of the assumptions used by Lazard in its weighted average cost of capital ("WACC") analysis;

(d)   To what metric were the terminal values applied; and

(e)   The range of values indicated by the EBITDA-based terminal value model, as distinguished from the range indicated by the earnings-based terminal value model.

116.   The omission of this information renders the following statements misleading:

(a)   On pages 40-41 of the Proxy:

*Public Market Discounted Cash Flow Analysis*

Lazard performed a public market discounted cash flow analysis of UNS Energy, which is a valuation methodology used to derive a valuation of a company by calculating the present value of estimated future cash flows of the company. "Future cash flows" refers to projected unlevered free cash flows of

-37-

a company. Lazard calculated the discounted cash flow value for UNS Energy as the sum of the net present value of each of:

- The estimated future cash flows that UNS Energy is expected to generate for each of years 2014 through 2023; and
- The estimated value of UNS Energy at the end of 2023, or the terminal value.

The estimated future cash flow was derived from data provided by UNS Energy under the UNS Energy management case, as the UNS Energy management case did not itself provide an explicit calculation of unlevered free cash flows. The following table sets forth the estimated unlevered free cash flow as calculated by Lazard for each of years 2014 through 2023:

| Fiscal Year Ending December 31, | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E |
| | | | | (in millions) | | | | | |
| ($163) | ($50) | $209 | $146 | $223 | $182 | $174 | ($0) | ($3) | $12 |

For its discounted cash flow calculations, Lazard applied discount rates ranging from 5.50% to 6.00%. Such discount rates were based on the mid-range of Lazard's judgment of the estimated range of weighted average cost of capital, based on a number of factors, including, among others, the average unlevered risk profile of UNS Energy's selected group of comparable companies as set forth above in "—Selected Comparable Company Multiples Analysis," UNS Energy's weighted after-tax cost of its long-term debt, and UNS Energy's consolidated leverage.

The terminal value of UNS Energy was calculated applying various exit EBITDA multiples ranging from 7.25x to 7.75x and applying various exit P/E multiples, ranging from 14.5x to 15.5x. The exit EBITDA multiples were selected by Lazard by reference to enterprise value to EBITDA trading multiples calculated for UNS Energy as well as the enterprise value to EBITDA trading multiples of the UNS Energy comparable companies. The exit P/E multiples were selected by Lazard by reference to P/E trading multiples calculated for UNS Energy as well as the P/E trading multiples of the UNS Energy comparable companies. Lazard applied such ranges of exit EBITDA multiples and exit P/E multiples to the relevant financial data of UNS Energy, consistent with the UNS Energy management case, to determine a terminal value for UNS Energy.

Lazard averaged the price per share ranges implied by these calculations and, from this analysis, estimated an implied price per share range

for shares of UNS Energy common stock, as compared to the per share merger consideration provided in the merger agreement as set forth below:

| Implied Price Per Share Range | Merger Consideration |
| --- | --- |
| $45.50 – $53.00 | $60.25 |

117.    The *Selected Precedent Transactions Multiples Analysis* on pages 41-42 is materially misleading and deficient because it fails to disclose:

(a)    The objective selection criteria used by Lazard to select the sample of precedent transactions;

(b)    A transaction-by-transaction breakdown of values and pricing multiples;

(c)    Why one-year forward multiples were examined from the precedent transactions, whereas multiples were chosen and applied to two-year forward EBITDA and earnings figures of UNS; and

(d)    The range of values indicated by the EBITDA multiples, as distinguished from the range indicated by the earnings multiples.

118.    The omission of this information renders the following statements misleading:

(a)    On pages 41-42 of the Proxy:

*Selected Precedent Transactions Multiples Analysis*

Lazard reviewed and analyzed selected precedent merger and acquisition transactions involving companies in the power and utilities industry it viewed as comparable to UNS Energy. In performing this analysis, Lazard reviewed certain financial information and transaction multiples relating to the companies involved in such selected transactions and compared such information to the corresponding information for UNS Energy. Specifically, Lazard reviewed 10 merger and acquisition transactions announced since May 2005 involving companies in the power and utilities industry for which sufficient public information was available.

1

2

The selected group of transactions reviewed in this analysis was as follows:

3

4

5

6

7

| Announcement Date | Acquiror | Target |
|---|---|---|
| 5/29/2013 | MidAmerican Energy Holdings Company | NV Energy, Inc. |
| 2/21/2012 | Fortis Inc. | CH Energy Group, Inc. |
| 7/12/2011 | Gaz Métro Limited Partnership | Central Vermont Public Service Corporation |
| 4/20/2011 | AES Corporation | DPL Inc. |
| 10/26/2007 | Macquarie Infrastructure Partners | Puget Energy, Inc. |
| 6/25/2007 | Iberdrola, S.A. | Energy East Corporation |
| 2/26/2007 | Kohlberg Kravis Roberts & Co. and Texas Pacific Group | TXU Corp. |
| 7/5/2006 | Macquarie Infrastructure Partners | Duquesne Light Holdings, Inc. |
| 2/27/2006 | National Grid plc | KeySpan Corporation |
| 5/24/2005 | MidAmerican Energy Holdings Company | PacifiCorp |

8

9

10

11

12

13

14

To the extent publicly available, Lazard reviewed, among other things, the P/E multiples of each of the target companies implied by the selected transactions by comparing the per share acquisition price to the relevant target company's estimated EPS at the time of the transaction for the fiscal year immediately following the fiscal year in which the relevant transaction was announced, and the EV/EBITDA multiples of each of the target companies implied by the elected transactions by comparing the enterprise value implied by the acquisition price to the relevant target company's estimated EBITDA for the fiscal year immediately following the fiscal year in which the relevant transaction was announced. Estimated EPS and EBITDA amounts for the target companies were based on publicly available Wall Street consensus estimates or other publicly available financial information and analyst research. The following table summarizes the results of this review:

15

16

| | Selected Precedent Transactions P/E Multiples | Selected Precedent Transactions Enterprise Value to EBITDA Multiples |
|---|---|---|
| High | 19.6x | 9.8x |
| Mean | 17.1x | 8.9x |
| Median | 17.6x | 8.8x |
| Low | 12.4x | 7.6x |

17

18

19

20

21

Based on an analysis of the relevant metrics for each of the transactions, Lazard applied a P/E multiple range of 16.5x to 18.5x to the 2014 estimated EPS of UNS Energy and a P/E multiple range of 15.5x to 17.5x to the 2015 estimated EPS of UNS Energy. Lazard also applied an EBITDA multiple range of 8.25x to 9.00x to the 2014 estimated EBITDA of UNS Energy and an EBITDA multiple range of 8.25x to 9.00x to the 2015 estimated EBITDA of UNS Energy. The 2014 and 2015 EPS and EBITDA estimates for UNS Energy were as reflected in the UNS Energy management case.

22

1
2
3

From this analysis, Lazard estimated an implied price per share range for shares of UNS Energy common stock, as compared to the per share merger consideration provided in the merger agreement as set forth below:

| Implied Price Per Share Range | Merger Consideration |
|---|---|
| $52.50 – $60.00 | $60.25 |

4
5

119.    The description of Lazard's *Premium-to-Market Analysis* on page 43 of the Proxy is materially misleading and deficient because it fails to disclose:

6

(a)    Why Lazard's range is skewed mostly below the median range.

7

120.    The omission of this information renders the following statements misleading:

8

(a)    On pages 43 of the Proxy:

9

*Premium-to-Market Analysis*

10
11
12
13

Lazard reviewed the premiums paid in the selected transactions listed above in "—Selected Precedent Transactions Multiples Analysis." The implied premiums in this analysis were calculated by comparing, to the extent publicly available, the per share acquisition price to the relevant target company's average closing share price for the 20-day period prior to the date the relevant transaction was announced. The premiums ranged from 9.4% to 52.6%, the median of premium was 22.1% and the mean of premium was 22.2%.

14
15
16
17

Based on the foregoing analysis, Lazard applied a range of premiums based on these transactions of 13.0% to 24.0% to the 20-day volume-weighted average share price of $47.89 of UNS Energy common stock as of December 10, 2013. From this analysis, Lazard estimated an implied equity value per share range for UNS Energy common stock, as compared to the per share merger consideration provided in the merger agreement as set forth below:

| Implied Price Per Share Range | Merger Consideration |
|---|---|
| $54.12 – $59.38 | $60.25 |

18
19
20

121.    The description of Lazard's *Infrastructure Returns Analysis* on pages 43-44 of the Proxy is materially misleading and deficient because it fails to disclose:

21
22

(a)    The value of performing this unorthodox analysis and the meaning of the results it yields;

      (b)     What metric was discounted in the performance of this analysis;

      (c)     How does this differ from the more ubiquitous Discounted Cash Flow analysis; and

      (d)     Why were different discount rates and terminal multiples assumed.

122.    The omission of this information renders the following statements misleading:

      (a)     On pages 43-44 of the Proxy, the statement:

*Infrastructure Returns Analysis*

Lazard performed an illustrative infrastructure returns analysis utilizing exit P/E multiples ranging from 16.5x to 18.5x, based on selected precedent transaction P/E multiples, and an assumed required equity return ranging from 10.0% to 12.0%, based on an illustrative required range of equity returns expected by long-term investors, in each case as applied to an assumed 2024 terminal year net income of $204 million. The results of this analysis implied an equity value per share range for UNS Energy common stock, as compared to the per share merger consideration provided in the merger agreement as set forth below:

| Implied Price Per Share Range | Merger Consideration |
| --- | --- |
| $51.00 – $57.75 | $60.25 |

123.    The information provided by Lazard in its *Miscellaneous* section on page 44 of the Proxy is materially misleading and deficient because it fails to disclose:

      (a)     Any services performed by Lazard for Fortis over the previous two years and the fees received from those services.

124.    The omission of this information renders the following statements misleading:

      (a)     On page 44 of the Proxy, the statement:

**Miscellaneous**

In connection with Lazard's services as financial advisor to UNS Energy with respect to the merger, UNS Energy agreed to pay Lazard a fee equal to $16,500,000, of which one-fifth became payable upon the rendering of Lazard's opinion and the remainder is contingent upon the closing of the merger. UNS Energy has also agreed to reimburse Lazard for certain expenses incurred in connection with Lazard's engagement and to indemnify Lazard and certain related persons under certain circumstances against various liabilities that may arise from or be related to Lazard's engagement, including certain liabilities under United States federal securities laws. Other than in connection with Lazard's services as financial advisor to UNS Energy with respect to the merger, Lazard and its affiliates have not received fees for providing financial advisory services to UNS Energy during the last two years.

An affiliate of Lazard was engaged on October 7, 2013 by a subsidiary of Fortis with respect to an unrelated matter of an insignificant size compared to the acquisition contemplated by the merger agreement for which Lazard has received and may continue to receive compensation. The maximum fee payable to such affiliate of Lazard in connection with this other engagement is expected to be no more than 10% of the fee that would be earned by Lazard if the merger is completed.

Lazard, as part of its investment banking business, is continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, secondary distributions of listed and unlisted securities, private placements, leveraged buyouts, and valuations for estate, corporate and other purposes. In addition, in the ordinary course, Lazard, LFCM Holdings LLC (an entity indirectly owned in large part by current and former managing directors of Lazard) and their respective affiliates and employees may trade securities of UNS Energy, Fortis and certain of their respective affiliates for their own accounts and for the accounts of their customers, may at any time hold a long or short position in such securities, and may also trade and hold securities on behalf of UNS Energy, Fortis and certain of their respective affiliates. The issuance of Lazard's opinion was approved by the opinion committee of Lazard.

Lazard is an internationally recognized investment banking firm providing a full range of financial advisory and other services. Lazard was selected to act as investment banker to UNS Energy because of its qualifications, expertise and reputation in investment banking and mergers and acquisitions generally and in the utility industry specifically, as well as its familiarity with the business of UNS Energy.

UNS Energy and FortisUS Inc. determined the per share merger consideration of $60.25 in cash per share of UNS Energy common stock, to be paid to the holders of UNS Energy common stock (other than the excluded holders) in the merger, through arm's-length negotiations, and our board of directors unanimously approved such per share merger consideration. Lazard did not recommend any specific consideration to our board of directors or any other person or indicate that any given consideration constituted the only appropriate consideration for the merger. Lazard's opinion was one of many factors considered by our board of directors, as discussed further in "—Reasons for the Merger; Recommendation of the UNS Energy Board" beginning on page 35.

125.   Additionally, the Proxy statement is deficient as it fails to provide complete and accurate financial projections and information related thereto, as created by Company management and, according to page 45 of the Proxy, relied upon by management, the Company's Board, Lazard, and Fortis.

126.   The information provided on pages 46-48 of the Proxy is materially misleading and deficient because it fails to disclose:

(a)   The issue price assumed for the 2 million shares of common stock in 2014 and the 1 million shares of common stock in 2015, the basis for the assumed issued price of these shares, and why the issuance of these three million shares was deemed necessary in the creation of the projections;

(b)   What "Other" refers to in the "Capital Expenditures and Other" category of the Selected Unaudited Base Case Financial projections provided on page 47, and, if "Other" constitutes material amounts, what was the year-to-year breakout of this subcategory;

1

(c)     The figures necessary to calculate the unlevered free cash flow, to the

2 extent that these were provided by management and not assumed by Lazard (*see supra* ¶

3 115.b), specifically the Company's projected changes in working capital and depreciation

4 and amortization expense; and

5

(d)     The figures related to the "upside projections" identified by

6 management.

7

127.    The omission of this information renders the following statements misleading:

8

(a)     On pages 46-48 of the Proxy, the statements:

9

The financial projections have not been updated, are not facts and
should not be relied upon as being indicative of future results. You are
10 cautioned not to rely on the financial projections. Some or all of the
assumptions that have been made in connection with the preparation of the
11 financial projections may have changed since the date the forecasts were
prepared. Neither UNS Energy nor any of its affiliates assumes any
12 responsibility for the validity, reasonableness, accuracy or completeness of the
financial projections. Neither UNS Energy nor any of its affiliates intends to,
13 and each of them disclaims any obligation to, update, revise or correct the
financial projections if any or all of them have become, are or become
14 inaccurate (even in the short term) since the time of their preparation. These
considerations should be taken into account in reviewing the financial
15 projections, which were prepared as of an earlier date.

16

The base case projections reflect various estimates and assumptions
made by UNS Energy, all of which are difficult to predict and many of which
17 are beyond UNS Energy's control, including, among others, the following
assumptions:

18

19       • average annual retail sales growth at TEP of approximately 2.0%
           during the period from 2015 through 2024, assuming the addition of a
           new industrial customer representing approximately 85 MW of new
20         load in 2016, but only 1.4% if the planned large industrial customer
           were excluded;

21       • the purchase of roughly an additional 35% interest in Springerville Unit
           1 in late 2014 and early 2015, as well as the purchase of the 550 MW

22

-45-

Gila River Unit 3 combined cycle plant at the end of 2014 with the effect of reducing power purchase contracts while adding rate base;

- planned capital spending totaling approximately $4.9 billion during the period from 2013 through 2024 in electric and gas utility plant; and
- issuances of 2 million shares of common stock in 2014 and 1 million shares of common stock in 2015.

Because the financial projections reflect subjective judgment in many respects, they are susceptible to multiple interpretations and frequent revisions based on actual experience and business developments. The financial projections also cover multiple years and such information by its nature becomes less predictive with each succeeding year. The financial projections constitute forward-looking information and are subject to a wide variety of significant risks and uncertainties that could cause the actual results to differ materially from the projected results, including, but not limited to, the factors described in the section entitled "Risk Factors" in UNS Energy's Annual Report on Form 10-K for the year ended December 31, 2012, UNS Energy's quarterly report on Form 10-Q for the period ended September 30, 2013, and in UNS Energy's other filings with the SEC. For additional information on factors that may cause UNS Energy's future financial results to materially vary from the projected results summarized below, see the section entitled "Cautionary Statement Concerning Forward-Looking Information." Accordingly, there can be no assurance that the projected results summarized below are indicative of the future performance of UNS Energy or that actual results will not differ materially from the projected results summarized below, and the financial projections cannot be considered a guarantee of future operating results and should not be relied upon as such.

The financial projections should be evaluated, if at all, in conjunction with the historical financial statements and other information regarding UNS Energy contained in UNS Energy's public filings with the SEC. The financial projections do not take into account any circumstances or events occurring after the date they were prepared, including the merger. Further, the financial projections do not take into account the effect of any failure of the merger to be consummated and should not be viewed as accurate or continuing in that context.

### Financial Projections

The following table summarizes the base case projections that were provided to our board of directors, Lazard and Fortis prior to the announcement of the transaction on December 11, 2013.

-46-

Selected Unaudited Base Case Financial Projections

($ in millions, except per share data)

| | For Fiscal Year Ending December 31 , | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2013E | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E |
| Total Operating Revenues | $1,477 | $1,541 | $1,566 | $1,643 | $1,702 | $1,744 | $1,804 | $1,870 | $1,941 | $1,999 | $2,044 | $2,209 |
| Gross Margin | $895 | $939 | $966 | $1,015 | $1,037 | $1,058 | $1,086 | $1,110 | $1,143 | $1,167 | $1,177 | $1,308 |
| EBITDA | $417 | $446 | $499 | $542 | $541 | $571 | $574 | $594 | $635 | $622 | $646 | $746 |
| Net Income for Common Shares | $130 | $140 | $158 | $171 | $166 | $173 | $175 | $181 | $197 | $187 | $207 | $232 |
| Diluted Earnings Per Share | $3.09 | $3.25 | $3.52 | $3.78 | $3.67 | $3.81 | $3.86 | $3.98 | $4.33 | $4.06 | $4.41 | $4.94 |
| Capital Expenditures and Other | $330 | $647 | $534 | $310 | $366 | $319 | $362 | $363 | $561 | $550 | $549 | $402 |
| Net Utility Plant | $3,535 | $4,064 | $4,288 | $4,386 | $4,513 | $4,598 | $4,725 | $4,845 | $5,158 | $5,460 | $5,770 | $5,894 |

In addition to the base case projections, our management identified the potential upside items relating to certain discrete aspects of the base case projections to reflect the possible upside case for the future financial performance of those aspects of UNS Energy's operations using more positive assumptions than those made in the base case projections. The potential upside items were provided to our board of directors, Lazard and Fortis. Lazard considered the potential upside items, but did not use them in connection with the financial analyses summarized in the section entitled "—Opinion of Lazard Frères & Co. LLC" because these items did not represent, in management's judgment, the most likely outcome for the future financial performance of UNS Energy but rather, as noted above, possible upside opportunities if certain assumptions underlying the base case projections proved to be more favorable than expected.

The potential upside items reflect various estimates and assumptions made by UNS Energy, all of which are difficult to predict and many of which are beyond UNS Energy's control. The items considered and evaluated which were deemed to have the potential to offer upside to UNS Energy's future results were as follows:

- an enhanced load growth scenario of 1% greater projected load growth for TEP, which would result in additional cumulative retail margins and would help reduce rate pressure on TEP's customers;
- the potential for incremental large retail customers, which would increase revenues and margins;

- an increase in UNS Energy's utilities' authorized equity capitalization ratio in the near-to-medium-term, which would provide a higher equity base;
- an increase in renewable energy assets through buyouts of existing renewable power purchase agreements, which would increase rate base on which to earn; and
- the procurement of additional gas-fired generation over and above the purchases included in the base case projections, and the forecasted addition of additional peaking units in 2021-2023, which would increase rate base.

128.   The omission of key information and figures related to Company management's projections renders the above statements materially misleading because, without full access to UNS's estimates of their future financial performance, shareholders cannot reliably assess the credibility of the various analyses performed by Lazard that incorporated these projections, and thus cannot determine whether the merger is indeed fair, as defendants and their financial advisor claim.

129.   Cumulatively, the information requested above is necessary for one to be able to evaluate and understand the sales process and analysis rendered in connection with the Proposed Transaction.  Therefore, the aforementioned omitted information is highly relevant and material to UNS shareholders.

130.   Accordingly, because the foregoing material misstatements and omissions represent a violation of federal law, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that he will suffer absent judicial intervention.

1

**CLAIMS FOR RELIEF**

2

**COUNT I**
3
**Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9
Promulgated Thereunder
(Against the Individual Defendants and UNS)**

4

131.   Plaintiff repeats and realleges each and every allegation set forth above as if
5
fully set forth herein.

6

132.   The Individual Defendants and UNS disseminated the false and misleading
7
Proxy specified above, which failed to disclose material facts necessary in order to make the
8
statements made, in light of the circumstances in which they were made, not misleading.

9

133.   The Proxy was prepared, reviewed, and/or disseminated by the Individual
10
Defendants and UNS.  It misrepresented and/or omitted material facts.

11

134.   In so doing, the Individual Defendants and UNS made untrue statements of
12
material facts and omitted to state material facts necessary to make the statements that were
13
made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9
14
promulgated thereunder.

15

135.   The Individual Defendants and UNS were at least negligent in filing the Proxy
16
with these materially false and misleading statements.

17

136.   The omissions and false and misleading statements in the Proxy are material
18
in that a reasonable shareholder would consider them important in deciding how to vote on
19
the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as
20
significantly altering the "total mix" of information made available in the Proxy and in other
21
information reasonably available to shareholders.

22

137.   By reason of the foregoing, the Individual Defendants and UNS have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

138.   Because of the false and misleading statements in the Proxy, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants and UNS)**

139.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

140.   The Individual Defendants acted as a controlling persons of UNS within the meaning of Section 20(a) of the Exchange Act, as alleged herein.   By virtue of their positions as officers and/or directors of UNS, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

141.   Each of the Individual Defendants and UNS were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

-50-

142.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

143.   UNS also had direct supervisory control over the composition of the Proxy and the information disclosed herein, as well as the information that was omitted and/or misrepresented in the Proxy.  UNS, in fact, disseminated the Proxy and is, thus, directly responsible for materially misleading shareholders because it permitted the materially misleading Proxy to be published to shareholders.

144.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants and UNS were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants and UNS participated in drafting and/or gave their input on the content of those descriptions.

145.   As set forth above, the Individual Defendants and UNS had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the

Exchange Act. As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT III
### Breach of Fiduciary Duties
### (Against the Individual Defendants)

146. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

147. The Individual Defendants' recommendation of the Proposed Transaction will result in change of control of the Company, which imposes heightened fiduciary responsibilities to maximize UNS's value for the benefit of the shareholders and requires enhanced scrutiny by the Court.

148. The Individual Defendants have violated their fiduciary duties of care, loyalty, candor, and food faith owed to public shareholders of UNS.

149. By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants are attempting to deprive unfairly Plaintiff and other members of the Class of the true value of their investment in UNS, or have otherwise failed to secure the best price reasonable under the circumstances for Plaintiff and other members of the Class.

150. As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of UNS because, among other reasons, they failed to take steps to reasonably inform themselves of the value of the Company by conducting a sufficient market check, they failed to obtain the maximized value of the Company for

UNS's shareholders, and they failed to fully advise UNS shareholders of the material information they need to cast a fully-informed vote.  The Individual Defendants dominate and control the business and corporate affairs of UNS and are in possession of private corporate information concerning UNS's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of UNS which makes it inherently unfair for the Individual Defendants to benefit their own interests to the exclusion of obtaining maximized shareholder and constituent value.

151.   As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not received and will not receive their fair portion of the value of UNS's assets and will be prevented from benefiting from a value-maximizing transaction.

152.   Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

153.   Moreover, the Individual Defendants have failed to fully disclose to Plaintiff and the Class all material information necessary to make an informed decision regarding the Proposed Transaction.

154.   By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations towards Plaintiff and the other members of the Class.

155.   As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of UNS's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

156.   Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

157.   Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

**COUNT IV**
**Aiding and Abetting**
**(Against UNS, Fortis, FortisUS, and the Merger Sub)**

158.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

159.   As alleged in more detail above, UNS, Fortis, FortisUS, and the Merger Sub are well aware that the Individual Defendants have not sought, and are not seeking, to obtain the best available transaction for the Company's public stockholders.

160.   Indeed, UNS, Fortis, FortisUS, and the Merger Sub have caused the Board to accept inadequate consideration, has extracted unreasonably preclusive deal protection

1  terms, and has otherwise aided and abetted the Individual Defendants' breaches of fiduciary

2  duties.

3                               **COUNT V**
   **Violation of Arizona Revised Statute (A.R.S.) § 10-830**
4                     **(Against the Individual Defendants)**

5          161.    Plaintiff repeats and realleges each and every allegation contained above as if

6  fully set forth herein.

7          162.    Pursuant to A.R.S. § 10-830, the director of a corporation must discharge his

8  duties in good faith, with the care an ordinarily prudent person in a like position would

9  exercise under similar circumstances, and in a manner the director reasonably believes to be

10 in the best interests of the corporation.

11         163.    By the acts, transactions, and courses of conduct alleged herein, the Individual

12 Defendants breached the standard of conduct imposed upon them pursuant to A.R.S. § 10-

13 830, thereby violating said statutory provision to the detriment of Plaintiff and the Class.

14         164.    As a result, Plaintiff and the Class members are being harmed.

15         165.    Plaintiff and the Class have no adequate remedy at law.

16                          **PRAYER FOR RELIEF**

17         **WHEREFORE**, Plaintiff demands judgment against defendants jointly and

18 severally, as follows:

19             (A)    Declaring this action to be a proper class action and certifying Plaintiff

20 as the Class representative and Plaintiff's counsel as Class counsel;

21

22                                  -55-

1    (B)    Declaring that the Individual Defendants have breached their fiduciary

2 duties;

3    (C)    Declaring that the Merger Agreement and Proposed Transaction were

4 entered into in breach of the Individual Defendants' fiduciary duties and is therefore

5 unlawful and unenforceable;

6    (D)    Preliminarily and permanently enjoining Defendants and all those

7 acting in concert with them from consummating the Proposed Transaction or performing the

8 same until such time, as any, that the Individual Defendants have adequately undertaken all

9 appropriate and available methods to maximize shareholder value;

10    (E)    In the event that the Proposed Transaction is consummated prior to the

11 entry of this Court's final judgment, rescinding the Merger Agreement and Proposed

12 Transaction, and/or awarding actual and punitive damages, with pre- and post-judgment

13 interest to Plaintiff and the other members of the Class;

14    (F)    Directing that Defendants account to Plaintiff and the other members of

15 the Class for all damages caused by them and account for all profits and any special benefits

16 obtained as a result of their breaches of their fiduciary duties;

17    (G)    Awarding Plaintiff the costs of this action, including a reasonable

18 allowance for the fees and expenses of Plaintiff's attorneys and experts; and

19    (H)    Granting Plaintiff and the other members of the Class such further

20 relief as the Court deems just and proper.

21

22    Respectfully submitted this 10th day of February 2014.

-56-

**LEVI & KORSINSKY, LLP**

By: /s/Shannon L. Hopkins
Shannon L. Hopkins, Esq.
733 Summer Street, Suite 304
Stamford, CT 06901


**CONANT LAW FIRM, PLC**
Paul A. Conant
Northern Trust Bank Tower, Suite 925
2398 East Camelback Road
Phoenix, Arizona  85016
*Attorneys for Plaintiff*


**CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and electronic service.


/s/ Kelly Naughton

4850-5535-1832, v. 1